## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

PALOMAR MEDICAL TECHNOLOGIES, INC. and THE GENERAL HOSPITAL CORPORATION,

       Plaintiffs,

       v.

CANDELA CORPORATION,

       Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 1:06-CV-11400-RWZ

## PLAINTIFFS' OPENING CLAIM
## <u>CONSTRUCTION BRIEF</u>

PALOMAR MEDICAL TECHNOLOGIES, INC. and THE GENERAL HOSPITAL CORPORATION

*By their attorneys*,

Wayne L. Stoner (BBO# 548015)
Vinita Ferrera (BBO# 631190)
Kate Saxton (BBO# 655903)
Lawrence Cogswell (BBO# 664386)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts  02109
(617) 526-6000

Dated:  May 29, 2007

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...........................................................................................................1

II.     BACKGROUND ............................................................................................................2

        A.      The '844 and '568 Patents ................................................................................2

        B.      The Technology of Skin, Hair, and Light ........................................................4

        C.      Candela's Infringing Devices ..........................................................................8

        D.      The Cutera Case Claim Construction Proceedings ........................................10

III.    BASIC PRINCIPLES OF CLAIM CONSTRUCTION ...............................................10

IV.     CLAIM TERMS IN DISPUTE....................................................................................11

        A.      Claim Term:  "Applicator" ('844 claims 1, 3, 12, 17, 27, 28)...........................11

        B.      Claim Term:  "Applying optical radiation … through said applicator to
                said skin region" ('844 claims 1, 12) ................................................................15

        C.      Claim Language:  "Pressure being applied to the applicator … so as to
                cause the applicator to deform the skin region thereunder" ('844 claim 12).........16

        D.      Claim language:  "Adapted to be in pressure contact with a portion of the
                skin surface… in said skin region" ('844 claim 27) ..............................................17

        E.      Claim Language: "The optical radiation being passed through the
                applicator to said skin region" (844 claim 27).........................................................18

        F.      Claim Language: "Element" ('844 claim 32) ........................................................19

        G.      Claim Language: "Wavelength … is selectively absorbed by the follicles"
                ('568 claim 8)..........................................................................................................21

V.      CONCLUSION.............................................................................................................22

# TABLE OF AUTHORITIES

Page

<u>Federal Cases</u>

<u>Berg Tech. v. Foxconn Int'l, Inc. No.</u>
  98-1324, 1999 WL 96414 (Fed. Cir. Feb. 23, 1999) ................................................................ 18

<u>Intamin Ltd. v. Magnetar Tech. Corp.,</u>
  Nos. 05-1546, 05-1579, 2007 WL 1138489 (Fed. Cir. April 18, 2007) .................................. 14

<u>Phillips v. AWH Corp,</u>
  415 F.3d 1303 (Fed. Cir. 2005) ......................................................................................... passim

<u>R.A.C.C. Indus. Indiv., Inc. v. Stun-Tech, Inc.,</u>
  No. 98-1186, 1998 WL 834329 (Fed. Cir. Dec. 2, 1998) ....................................................... 18

<u>Rambus Inc. v. Infineon Tech. AG,</u>
  318 F.3d 1081 (Fed. Cir. 2003) ........................................................................................ 13, 19

<u>SciMed Life Sys. Inc. v. Advanced Cardiovascular Systems Inc.,</u>
  242 F.3d 1337 (Fed. Cir. 2001) .............................................................................................. 15

<u>SRI Int'l v. Matsushita Electric Corp.,</u>
  775 F.2d 1107 (Fed. Cir. 1985) (en banc) .............................................................................. 15

## I.      INTRODUCTION

All but one of the patent claim terms in dispute in this case were construed previously by the Court, after extensive briefing and argument, in the case of <u>Palomar Medical Technologies, Inc. and The General Hospital Corporation v. Cutera, Inc.</u>, Civil Action No. 02-10258-RWZ (Memoranda of Decisions and Orders of February 24, 2004 [Docket No. 77] and December 12, 2005 [Docket No. 173]).  (<u>See</u> Exhibits 1 and 2 to the Plaintiffs' Appendix, submitted herewith).

In reliance upon the Court's claim constructions in the <u>Cutera</u> litigation, Cutera agreed to a judgment entered by the Court (Docket Nos. 266, 268) that the U.S. Patent No. 5,735,844 ("844 patent") was infringed, valid, and enforceable and paid the plaintiffs over $17 million plus undertook an obligation to pay ongoing royalties.  (<u>See</u> Plaintiffs' Appendix, Ex. 5).  In addition, since the <u>Cutera</u> litigation and in light of the Court's claim construction therein, three other companies have also agreed to license the patents in suit, including:

- Cynosure, Inc. paid the plaintiffs over $10 million plus undertook an obligation to pay ongoing royalties, and agreed not to challenge the validity or enforceability of the patents or the infringement of the patents by its current products.  (<u>See</u> Plaintiffs' Appendix, Ex. 6).

- Alma Lasers agreed to a judgment entered by the Court that the patents in suit were infringed, valid, and enforceable and paid the plaintiffs over $4 million plus undertook an obligation to pay ongoing royalties.  <u>See Palomar Medical Technologies et al. v. Alma Lasers, Inc.</u>, Civil Action No. 06-11171-RWZ (Docket Nos. 19, 20)  (<u>See</u> Plaintiffs' Appendix, Ex. 7).

In this case, the defendant Candela has changed its proposed claim constructions over time.  However, all of its current constructions are different from (narrower than) what the Court

ruled in the <u>Cutera</u> case and are, in fact, in some cases very similar to what Cutera proposed

(repeatedly) and the Court rejected (repeatedly).

There are two patents asserted in this case: the '844 patent that the Court construed in the

<u>Cutera</u> case (Plaintiffs' Appendix, Ex. 3), as well as the "parent" of the '844 patent, U.S. Patent

No. 5,595,568 (Plaintiffs' Appendix, Ex. 4), from which the '844 patent is a "continuation-in-

part."

Candela has proposed constructions for six (6) claim terms of the '844 patent. All of

these terms were construed previously by the Court in the <u>Cutera</u> case. For all of these terms,

Candela proposes different and narrower constructions than what the Court adopted. The

plaintiffs propose that the Court adopt its previous constructions, except with respect to the

single claim term "element" (with which, as the Court knows from the judgment entered in the

<u>Cutera</u> case [Docket No. 268, Plaintiffs' Appendix, Ex. 5 at ¶ 5], the plaintiffs respectfully

disagree).

In addition, Candela has proposed one term from the '568 patent for construction.

The parties' Joint Claim Construction Statement, which identifies the claim terms in

dispute and the parties' respective proposed constructions with respect to them, is attached hereto

as Exhibit A.

## II.    **BACKGROUND**

### A.    **The '844 and '568 Patents**

The '844 patent is titled "Hair Removal Using Optical Pulses;" the '568 patent is titled

"Permanent Hair Removal Using Optical Pulses." (<u>See</u> Plaintiffs' Appendix, Exs. 3 and 4).

Both patents have identical inventors and largely identical specifications. The '844 patent has

some additional material in the specification that was added when its "continuation-in-part" application was filed.

Both patents are owned by The General Hospital Corporation, a/k/a Massachusetts General Hospital ("MGH"), and grew out of work done by the inventors there. The first-named inventor on the patents, Dr. R. Rox Anderson of MGH, is the undisputed leading pioneer in light-based hair removal. Dr. Anderson and his colleagues at MGH, Dr. Melanie Grossman and Mr. William Farinelli, made their inventions in 1992-93, filed their original patent application on February 1, 1995, and filed their second, continuation-in-part patent application on January 30, 1996. The '568 patent issued January 21, 1997, and the '844 patent issued April 7, 1998.

MGH has exclusively licensed the patents to Palomar, who both practices them commercially with products of its own and sublicenses them to others. Many companies, including competitors of Candela and Palomar, have taken licenses to the patents and paid Palomar and MGH over $60 million in royalties to date.

The patents describe methods and devices for the simultaneous removal of a plurality of hairs from skin (removing more than one hair at the same time) using optical radiation – light – such as light from a laser. After extensive research and experimentation, the inventors discovered parameters of light (such as wavelength, energy per unit area [fluence], and duration of a pulse) that would be effective to damage the structures in the skin that cause hair to grow – follicles – while minimizing damage to surrounding skin. As the '844 patent Abstract states:

> A method and apparatus for simultaneously effecting the removal of
>
> multiple hairs from a skin region by using light energy to destroy hair
>
> follicles in the region …. Parameters for the irradiation, including
>
> pulse duration, are selected to effect complete damage of desired

- 3 -

portions of the hair follicles … with minimal damage to surrounding

tissue and to the patient's epidermis.

In addition to formulating appropriate parameters for light to remove hair, the inventors also describe in the patents various other optional concepts that can be useful for safe and effective hair removal:

- <u>Cooling</u> of the skin before/during irradiation of the skin with light

- <u>Contact</u> with the skin surface

- <u>Pressure</u> on the skin

- <u>Convergence</u> of the light

- <u>Matching</u> of the refractive index of skin and light applicator

- <u>Temporary</u> hair removal

These different features of the patent are the subject of different claims.  Not all claims require all of these features.  For example, some claims require cooling but not contact or pressure.  Some claims require pressure.  Some claims focus on the appropriate light parameters.

**B.**     **<u>The Technology of Skin, Hair, and Light</u>**

Unwanted hair is a problem as old as humankind.  Sometimes it is a medical issue, such as where grafted skin grows hair in unwanted places (such as in the throat of a throat cancer patient) or where eyelashes grow inward into the eyes.  Sometimes unwanted hair is a cosmetic issue.  Sometimes it is a combination (such as women with beards).

Techniques for removing unwanted hair are also very old.  Most of these are temporary, such as shaving, plucking, or wax epilating.  A "more permanent" technique of electrolysis

- 4 -

(electrical current flowing through a needle inserted into the skin to damage individual hair follicles) was also developed.  However, for some people, all of these techniques can have disadvantages, and there has long been a desire for permanent (but not disfiguring, painful, or tedious) hair removal.

Hair grows out of structures in the skin called follicles, which have the following anatomy:



**Hair shaft** containing melanin

**Epidermis** containing melanin

**Stem cells** responsible for hair growth cycle (does not contain melanin)

**Hair matrix** is the factory of hair follicle cells and shaft. Hair matrix has the highest melanin concentration

**Hair papilla** is the root or base of the hair follicle

To remove hair "permanently" requires damaging the stem cells, matrix, and/or papilla of a follicle.

This damage can be effected with heat.  However, heat can also burn surrounding skin. Various techniques have been tried to apply heat to hair follicles (radio waves, electricity, light targeted at individual follicles); all had disadvantages.

The ideal technique would apply enough heat to damage the hair follicle matrix and/or stem cells that cause hair growth without significantly damaging the surrounding skin or other

- 5 -

tissue or causing pain to the patient.  The ideal treatment would also treat many hairs at once, because treating hairs individually is an impractically long and tedious process.

The '844 and '568 patents describe and claim such a treatment.  This treatment uses light.

Light can be produced in <u>pulses</u>, instead of a "continuous wave" such as from an ordinary flashlight.  These pulses of light have a number of characteristics or "parameters:"

- <u>Energy</u>:  A pulse of light contains energy, which allows the pulse to create heat in a "target" struck by the pulse.  It is usually measured in Joules ("J").

- <u>Wavelength</u>:  This is roughly the "color" of the light and determines how much of the energy of the pulse will be absorbed by a particular substance.  It is usually measured in nanometers (nm).

- <u>Pulse duration</u>:  This is how long the pulse of light lasts and is usually measured in fractions of a second (such as milliseconds [ms], microseconds [µs], or nanoseconds [ns].

- <u>Spot size</u>:  This is the illuminated area created by the pulse on a surface when it strikes the surface.  It is usually measured in centimeters (cm).

- <u>Fluence</u>:  This is energy per unit area – the amount of energy in the pulse divided by its spot size – and is often expressed in joules per square centimeter ("$J/cm^2$").

The '844 and '568 inventors discovered the parameters of light that could be used for safe and effective hair removal, using a general technique called "selective photothermolysis," which technique inventor Dr. R. Rox Anderson and another physician published in the early 1980s.  As described in a paper that Dr. Anderson published in 1983 in <u>Science</u>, selective photothermolysis is selectively damaging tissue with light:

- 6 -

> This technique relies on selective absorption of a brief radiation pulse to generate and confine heat at certain pigmented targets. An absolute requirement is that the targets have greater optical absorption at some wavelength than their surrounding tissues. During laser exposure, absorption convert[s] … radiant energy into heat …. The targets begin to transfer this heat to their cooler surroundings mainly by thermal diffusion, but this process takes some time … . At the end of an appropriately brief laser exposure, the temperature of the target may easily have surpassed that required for thermal denaturation while that of the surrounding tissue remains well below this temperature.

(R. R. Anderson and J.A. Parrish, <u>Science</u>, **220**, 524 (1983), pp. 524-5).

Inventing a method to apply this general technique to hair removal, the inventors chose a wavelength (or range of wavelengths) of light that would be absorbed more readily by the melanin pigment that is concentrated in the hair shaft, follicles, and matrix than by the surrounding skin which contains less melanin. This meant that the light could penetrate the skin over a broad area, without damaging the skin, while being absorbed by the melanin concentrated in several hair follicles.



Thermal injury of stem cells causes permanent hair loss

Thermal destruction of hair bulb stops hair growth

Photons

- 7 -

However, the goal is not to destroy melanin but hair structures that contain melanin (or, in the case of stem cells, which do not).  This is done by allowing the concentrated melanin in the hair follicles to absorb the energy of the light, and then allowing the heat generated to diffuse outwardly in order to damage the hair structures – but (ideally) nothing beyond them.

Doing this requires the proper pulse duration and fluence – long and high enough to allow the heat to diffuse far enough to damage the hair structures, but short and low enough that the heat does not diffuse too far or significantly damage the skin.

### C.    Candela's Infringing Devices

The plaintiffs have accused four (4) Candela products of infringement.  Three (the "GentleLASE," the "GentleYAG," and the "GentleMax") are laser products.  The fourth (the "LightStation 100") is an "intense pulsed light" or "IPL" system.  The laser products are accused of infringing five independent claims (1, 12, 19, 27, and 32) and four dependent claims (6, 7, 8 and 20) of the '844 patent.  The LightStation 100 device is accused of infringing all of these same claims plus one additional independent claim (17) and two additional dependent claims (3 and 28) of the '844 patent plus 16 claims (two independent) of the '568 patent.

All of these devices operate squarely within the preferred light parameters described in the '844 and '568 patents:

- Wavelength of 680-1200 nm ('844 patent, col. 8, ll. 47-52)

- Pulse duration  of about 50µs – 200µs (col. 12, ll. 5-15)

- Energy/Fluence of about 10-200 J/cm$^2$ (col. 11, ll. 44-46)

All of Candela's accused devices also utilize other concepts described and claimed in the patents such as cooling (in the case of the lasers, using a cryogenic spray), pressure, and

- 8 -

convergence.  In addition, the LightStation device also has "a large-area optical radiation field delivered by a transparent device in contact with the skin region" made of sapphire (which has a refractive index matching that of the skin) as claimed in the '568 patent.

Candela has known of the '568 and '844 patents for many years.  Palomar first notified Candela of the patents in 1999. Palomar repeatedly tried to resolve Candela's infringement by a license outside of litigation, but Candela refused, and Palomar was forced to commence this lawsuit in August 2006.

Candela's construction of the claims of the patents has changed in the course of this case. On April 20, 2007, eight months after the case commenced, and at least eight years after Candela learned of the patents, Candela delivered to the plaintiffs its "Preliminary Proposed Claim Constructions."  (Plaintiffs' Appendix, Ex. 8).  In this document, Candela did not identify any claim terms of the '568 patent as needing construction, but identified eight terms of the '844 patent as needing construction, including two that Candela contended were "indefinite" (i.e., incapable of construction).  In this document, Candela adopted the Court's prior construction of "element," but otherwise advanced different and narrower constructions than those which the Court had adopted in the Cutera case.

Then, a few weeks later, on the day that the parties' Joint Claim Construction Statement was due to be filed in Court (May 11, 2007), Candela dropped its contention that two claim terms were indefinite, added a term from the '568 patent claims to be construed, and revised its proposed constructions for four of the six remaining '844 patent disputed claim limitations. Now, all of Candela's proposed constructions are narrower than what the Court ruled in the Cutera case (and, in some instances, narrower even than what Candela [or Cutera] proposed originally).

- 9 -

D.        **The Cutera Case Claim Construction Proceedings**

Leading up to the Court's constructions in the Cutera case, the plaintiffs and Cutera each filed both opening and responsive claim construction briefs and, between them, six (6) notices of supplemental authority and responses thereto, and on June 12, 2003, the Court held a lengthy Markman hearing.  (See Docket Nos. 35, 39, 41, 46, 49, 50, 55, 63, and 75).  The Court then entered its February 24, 2004 Memorandum of Decision and Order construing the claims. (Plaintiffs' Appendix, Ex. 1, Docket No. 77).

Cutera then moved to modify the Court's construction of one claim term, "applicator," in light of the Federal Circuit's decision in Phillips v. AWH Corp, 415 F.3d 1303 (Fed. Cir. 2005) and other decisions.  (Docket Nos. 167-68).  Two more briefs, and another notice of supplemental authority and response thereto, were filed.  (Docket Nos. 169, 170, 171, 172).  The Court then denied Cutera's motion to modify on December 12, 2005.  On that same date, the Court entered another Memorandum of Decision and Order (Docket No. 173).  This Decision reiterated the Court's decision that Cutera's proposed construction of "applicator" – very similar to what Candela argues here – was incorrect.

On June 16, 2006, final judgment was entered in the Cutera case.  (Plaintiffs' Appendix, Ex. 5, Docket No. 268).  In that final judgment, the Court provided (among other things) that "[t]he Court's construction of the term "element' in claim 32 of the '844 patent as set forth in the Court's February 24, 2004 Memorandum of Decision and Order applies solely to this [Cutera] case."

III.    **BASIC PRINCIPLES OF CLAIM CONSTRUCTION**

The Federal Circuit reaffirmed the basic principles of claim construction in Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), cert. denied, 546 U.S. 1170 (2006).

- 10 -

Briefly stated, those principles are as follows:  The words of a claim are to be given the ordinary

and customary meaning that a person of ordinary skill in the art would have understood the claim

language to have in light of the patent documents at the time the patent application was filed.

See id. at 1313.  A court should derive this "ordinary and customary meaning" by looking to the

claim language, the specification, and the prosecution history.  See id. at 1312-13.  In

conjunction with this intrinsic evidence, a court may also consider extrinsic evidence—such as

dictionaries— although such evidence is generally "less significant" than the intrinsic record in

determining the meaning of claim language.  See id. at 1317, 1318.

## IV.    CLAIM TERMS IN DISPUTE

### A.    Claim Term:  "Applicator" ('844 claims 1, 3, 12, 17, 27, 28)

| Court Cutera Construction/ Palomar/MGH Construction | Candela Original Construction | Candela Revised Construction |
|---|---|---|
| A device for applying optical radiation. | A device for applying optical radiation through a surface in contact with an area of skin from which multiple hairs are to be removed.  As defined by the patent specification, an applicator is not a device that cools the skin cryogenically. | A device for transmitting optical radiation by contact with an area of skin from which a plurality of hairs are to be simultaneously removed. By disclaimer in the patent specification, an applicator is not a device that cools skin cryogenically. |

"Applicator" is a broad, general term whose plain meaning is "a device for applying."

See, e.g., Webster's New Collegiate Dictionary, at 97 (9th Ed. 1986) (Plaintiffs' Appendix, Ex.

9).  In the context of the '844 patent, the substance being applied is light or optical radiation.

Therefore, an applicator in the context of the patent is a device for applying optical radiation.

All parties (at least Candela originally) agreed with the Court's Cutera construction that an

applicator is that.

- 11 -

The problem is that Candela (like Cutera before it) then wishes to import several other limitations into the general term "applicator." First, Candela says the applicator must apply or transmit radiation by a surface in contact with the skin. Second, Candela says that the contact with the skin must be with that area of skin from which multiple hairs are to be removed. Third, Candela asserts that there is a "definition" or "disclaimer" in the patent that excludes cryogenic cooling from an "applicator." These proposed constructions are not consistent with the claim language, specification, or prosecution history.

As an initial matter, the Court in the <u>Cutera</u> case (repeatedly) rejected the first two limitations proposed by Candela to be imported into the claim term. As the Court stated in its December 12, 2005 Order:

> Again, Cutera is attempting to a read limitation into claim 27 that does not exist. During the claim construction phase, Cutera asserted the same position, contending that claim 27 required that optical radiation be applied to the skin "through the surface of the applicator in contact with the skin surface." The Court rejected that argument at the time and continues to do so. Claim 27 requires (1) that the applicator be placed in pressure contact with the targeted skin region; (2) that optical radiation be passed through the applicator; and (3) that the optical radiation passed through the applicator be applied to the targeted skin region. It does not, however, purport to require that all three of those elements occur simultaneously, nor, under the Court's claim construction order, does claim 27 require that optical radiation pass through the portion of the applicator whose surface is in contact with the patient's skin.

(Plaintiffs' Appendix, Ex. 2, at 8).

Following the Court's construction, both Cutera and Cynosure, whose products both (like those of Candela) have applicators whose light emitting surface is not in contact with the skin, took licenses to the '844 patent and paid the plaintiffs a combined $27 million plus ongoing royalties.

- 12 -

Nonetheless, Candela is making the same argument all over again.

The claim language does not support Candela's construction.  The claim language never requires that an "applicator" have any of the characteristics with which Candela wants to limit the claim.  To be sure, various claims describe various optional kinds or uses of applicators (e.g., certain claims require an applicator that is placed in contact with the skin; claim 17 describes an applicator with a matching refractive index to that of the skin; and claim 31 describes a surface of an applicator that has a slot formed in it).  But the claims never require that an "applicator" in and of itself have any of these characteristics.  Indeed, if an "applicator" itself already had these characteristics, the additional language in these claims would be redundant and meaningless. Rambus Inc. v. Infineon Tech. AG, 318 F.3d 1081, 1093 (Fed. Cir. 2003) (disfavoring construction that renders "meaningless" language in dependent claims).

When the patents claim a device with the characteristics that Candela wishes an "applicator" to have, they do so explicitly.  The '568 patent claims 1 and 11 require "a transparent device in contact with the skin region."  The '844 claims do not use this terminology but use a broader, more generic term, "applicator."  See, e.g., Phillips, 415 F.3d at 1314 ("Differences among claims can also be a useful guide in understanding the meaning of particular claim terms.").

The specification also is not consistent with Candela's proposed construction.  The '844 patent specification describes a "contact device" as ***a part of*** an illustrated applicator, not as the applicator itself.  (See Plaintiffs' Appendix, Ex. 3, '844 patent, Figs. 2A and 2B and col. 5, ll. 22-40 ["…the applicator or irradiating unit 18 … contact device 46 … ."])  The patent specification describes this contact device as part of an applicator as optional, not mandatory:  "An applicator suitable for use … **may** include … a surface shaped to contact the skin surface … ."  (Id., col.

- 13 -

3:17-20) (emphasis added).  The specification also goes on to describe the delivery of optical

radiation "from air" as opposed to from a contact device.  (See id., Fig. 6 and col. 10:66-11:30)

(emphasis added).

As far as Candela's assertion that the patent contains a "definition" of applicator or

"disclaimer" from an applicator of cryogenic cooling, there is no such definition or disclaimer.

To the contrary, the '844 patent expressly says that the claimed cooling can be done

cryogenically as some of Candela's devices do:

> Further, while cooling water has been shown for the preferred
> embodiment to cool contact device 46, this is not a limitation on
> the invention and other cooling techniques may be utilized.
> …Other cooling techniques known in the art may also be utilized.
>
> Other embodiments are within the scope of the following claims.
> For example, the contact device may not be cooled or cooling of
> the epidermis may be performed without an applicator (for
> example, cryogenically).  When an applicator is not utilized,
> radiation is applied directly to the region of interest after passing
> through the appropriate optics.

(Plaintiffs' Appendix, Ex. 3, '844 patent, col. 15, ll. 32-47) (emphasis added).

Far from being a "disclaimer," this language expressly contemplates cryogenic cooling.

In relation to an "applicator," at most it says that if one uses cryogenic cooling, one does not

need to use an applicator.  However, this language never says or suggests that one cannot use an

applicator with cryogenic cooling, or cryogenic cooling with an applicator, let alone "disclaims"

such a possibility.

Candela's argument here is very similar to that the Federal Circuit recently rejected in

Intamin Ltd. v. Magnetar Tech., Corp., Nos. 05-1546, 05-1579, 2007 WL 1138489, at *1 (Fed.

Cir. April 18, 2007).  In Intamin, the claim required an "intermediary," and the specification at

one point described a "non-magnetic" intermediary.  This did not limit the claim:

- 14 -

The district court seized on this disclosure to limit the term "intermediary" to non-magnetic substances only.  Initial Decision, slip op. at 4.  As this court has repeatedly noted, see SRI Int'l v. Matsushita Electric Corp., 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc) (plurality opinion), a narrow disclosure in the specification does not necessarily limit broader claim language.  Phillips, 415 F.3d at 1323.  The overall context of the patent, in this case, does not specifically disavow magnetic intermediaries.  See e.g., SciMed Life Sys. Inc. v. Advanced Cardiovascular Systems Inc., 242 F.3d 1337, 1341 (Fed. Cir. 2001).  The single reference does not expressly limit the entire invention but only describes a single embodiment.  Moreover, the term "intermediary," like the term "baffle" in Phillips, embraces more than the limited specification disclosure.

Id. at *5.

**B.    Claim Term:  "Applying optical radiation … through said applicator to said skin region" ('844 claims 1, 12)**

| Court Cutera Construction/ Palomar/MGH Construction | Candela Construction |
|---|---|
| Applying optical radiation through the applicator that is in contact with the skin surface to the area of skin from which a plurality of hairs is to be simultaneously removed. | Applying optical radiation through the surface of the applicator that is in contact with the skin surface to the area of skin from which a plurality of hairs is to be simultaneously removed. |

As with "applicator," Cutera again seeks to limit the '844 claims to require that the optical radiation pass through the surface of the applicator that is in contact with the skin.  Again, as set forth above, the Court has already (repeatedly) rejected this construction.  Candela's proposed construction is virtually identical to that advanced by Cutera, which was "applying optical radiation through the surface of the applicator in contact with the skin surface into the skin region."  (See Altus Opening Claim Construction Brief [Docket No. 39], at 12).  In its February 24, 2004 Order, the Court stated that this proposed construction would "improperly limit the scope of the patent."  See also Plaintiffs' Appendix, Ex. 2, at 8 ("[N]or, under the

- 15 -

Court's claim construction order, does claim 27 require that optical radiation pass through the portion of the applicator whose surface is in contact with the patient's skin.")

Candela's proposed construction remains incorrect for the reasons set forth above with respect to "applicator."

### C.   Claim Language:  "Pressure being applied to the applicator … so as to cause the applicator to deform the skin region thereunder" ('844 claim 12)

| Court Cutera Construction/ Palomar/MGH Construction | Candela Original Construction | Candela Revised Construction |
|---|---|---|
| Pressure being applied to the applicator so as to cause the applicator to compress the area of the skin under it. | Applying a force greater than the weight of the applicator so as to cause the applicator to compress the area of skin from which a plurality of hairs are to be removed. | Pressure being applied to the applicator so as to cause the applicator to press down on the entire area of skin from which a plurality of hairs is to be simultaneously removed. |

Candela has advanced different and inconsistent proposed constructions of this claim term.  Candela first advanced a construction that was in some way similar to what the Court ruled in the Cutera case, but then sought to restrict the claim such that the pressure applied to the applicator must be "a force greater than the weight of the applicator."  Apparently recognizing the incorrectness of this argument, which has no support in the claim language or specification and would again be inconsistent with the Court's December 12, 2005 Order in the Cutera case (at 5-7), Candela has abandoned it.

Now, Candela proposes (which originally it did not) that the pressure applied to the applicator does not cause the applicator to compress the area of the skin under it but instead must compress "the entire area of skin from which a plurality of hairs is to be simultaneously removed."  Candela apparently intends to argue, in pursuit of a noninfringement argument, that

although the Candela applicator does compress the skin under it, it does not compress "the entire area of skin from which a plurality of hairs is to be simultaneously removed."

The claim language does not support Candela's argument. The claim never even mentions "the entire area of skin" or anything like it. The claim just says that the applicator is placed in contact with the skin surface in the skin region from which one wishes to remove hair, and that pressure applied to the applicator deforms (compresses) the skin region under it. The claim never says that the "entire" region of skin needs to be compressed or anything like that.

The specification also does not support Candela's argument. For example, Figure 2A of the patent shows a skin region 20 from which hair is to be removed. (<u>See</u> Plaintiffs' Appendix, Ex. 3, col. 4, ll. 30-34; col. 5, ll. 23-25). Figure 2A shows only a portion of the skin region being compressed, not its "entire area." Figure 2B and 3A are the same. (<u>See</u> <u>also</u> <u>id</u>., col. 6, l. 49 – col. 7, l. 12). The specification is consistent that the applicator pressure just compresses the skin under it (as the Court ruled), not the "entire area of skin" from which hair is to be removed.

**D. Claim language: "Adapted to be in pressure contact with a portion of the skin surface… in said skin region" ('844 claim 27)**

| Court <u>Cutera</u> Construction/ Palomar/MGH Construction | Candela Original Construction | Candela Revised Construction |
|---|---|---|
| Touching with pressure a portion of the skin surface | Fit for applying a force greater than the weight of the applicator to the entire area of skin from which a plurality of hairs are to be removed. | Fit for (<u>i.e.</u>, constructed for) pressing down on a portion of the skin surface from which a plurality of hairs are to be simultaneously removed |

Candela's revised proposed construction now requests (which its original construction did not) that the Court rule that the claim 27 applicator must be specifically "constructed for" the propose of applying pressure to a portion of the skin surface. Candela apparently intends to

- 17 -

argue, in pursuit of a noninfringement argument, that although its applicator touches with pressure a portion of the skin surface, it is not "constructed for" that purpose.

That is not what the claim language "adapted" means.  The Federal Circuit has ruled that the word "adapted" in a claim just means "capable of."  In <u>R.A.C.C. Indus. Indiv., Inc. v. Stun-Tech, Inc.</u>, No. 98-1186, 1998 WL 834329, at * 4 (Fed. Cir. Dec. 2, 1998) (unpublished), <u>cert. denied</u>, 526 U.S. 1098 (1999) (attached hereto as Exhibit B), a claim required a device "adapted for concealment."  The court ruled that

> This functional language limits the scope of these claims to devices that have the *capability* of being concealed … The district court therefore also correctly construed claims one and four as requiring the *capability* of being concealed although not requiring concealment in actual use.

<u>Id</u>. (second emphasis added); <u>see also</u> <u>Berg Tech. v. Foxconn Int'l, Inc</u>. No. 98-1324, 1999 WL 96414, at *3 (Fed. Cir. Feb. 23, 1999) (unpublished) (attached hereto as Exhibit C) ("The term 'adapted to' is often used in claim drafting to indicate 'capable of.'").  Therefore, an applicator that is "adapted to be in pressure contact" in claim 27 is an applicator capable of being in pressure contact, not one "constructed for" that purpose.

### E.  Claim Language: "The optical radiation being passed through the applicator to said skin region" (844 claim 27)

| Court <u>Cutera</u> Construction/ Palomar/MGH Construction | Candela Revised Construction |
|---|---|
| Optical radiation going by way of an applicator to the area of skin from which a plurality of hairs is to be simultaneously removed | Passing optical radiation through the surface of the applicator that is in contact with the portion of the skin surface from which a plurality of hairs are to be simultaneously removed |

Candela's proposed construction, very similar to that proposed by Cutera in seeking to make the claim require that the optical radiation pass through the portion of the applicator whose

- 18 -

surface is in contact with the skin, is incorrect for the same reasons set forth above with regard to "applicator" and "applying optical radiation…" in claims 1 and 12.

### F.       Claim Language: "Element" ('844 claim 32)

| Court Cutera Construction | Palomar/MGH Construction | Candela Original Construction | Candela Revised Construction |
|---|---|---|---|
| A device or component of a device for converging optical radiation | A device or component of a device | A device or component of a device for converging optical radiation | A device or component of a device for converging optical radiation as it enters the skin |

As the Court is aware, the plaintiffs respectfully disagree with the Court's construction of the term "element" from the Cutera case.  The term "element" is broad and general, and its plain meaning does not contain or connote convergence of radiation.  The specification never redefines the term differently.  And nothing in claim 32 itself says or suggests that the "element" must converge optical radiation.

When the '844 inventors wanted to specify that a device converges light, they said so explicitly.  For example, claim 11 requires of the applicator "converging the optical radiation." Claim 32 contains no such language.

Claims 21 and 25 require specifically "an element … for converging the optical radiation …".  If the term "element" in and of itself required convergence, this additional language in claims 21 and 25 requiring convergence -- which does not appear in claim 32 --would be superfluous and meaningless.  Rambus, 318 F.3d at 1093 (construction rendering language of dependent claims "meaningless" is disfavored).

The specification also describes devices or components of a device (i.e., elements) that do not converge optical radiation.  In Figure 6 and col. 10, l. 66- col. 11, 1.30, the patent describes

- 19 -

illuminating skin with optical radiation that either can be "collimated" (not convergent) or else convergent.  Table 1 in Column 12 similarly describes optical radiation beams at the skin surface which can be either "collimated or convergent."  The specification (col. 6, ll. 10-12) only speaks of a contact device "preferably" "formed into a lens shape in order to converge the irradiating field," not that this is a requirement.  (See Plaintiffs' Appendix, Ex. 3, '844 patent).

Likewise, the prosecution history contains nothing that suggests that the general term "element" must be limited to an element "for converging optical radiation."

Candela originally proposed the Court's construction of the term from the Cutera case. Now, however, Candela proposes an even narrower construction: not only must the element converge optical radiation, it must now do so in a particular way, "as it enters the skin."  Candela apparently intends to argue, in pursuit of a noninfringement argument, that although its product(s) contain a device for converging optical radiation positioned over the skin, they do not converge optical radiation "as it enters the skin."

Claim 32 and the term "element" do not mention, suggest, or connote convergence at all, let alone a specific kind or place of convergence.  Claim 32 does not require that the element be "on" the skin surface at all but only "over" it, and such an element would not necessarily converge optical radiation "as it enters the skin."  And the specification, as detailed above, describes radiation entering the skin that can be either convergent or non-convergent.

- 20 -

G.    **Claim Language: "Wavelength … is selectively absorbed by the follicles"**
      **('568 claim 8)**

| Palomar/MGH Construction | Candela Construction |
|---|---|
| A wavelength that is absorbed more readily by the follicles than surrounding material | A wavelength that is effectively absorbed by hair follicles and not by the skin |

This is the only term that the parties have identified for construction from the '568 patent and the only disputed term that the Court did not construe previously in the Cutera litigation.

Dependent claim 8 of the '568 patent specifies that the wavelength of the optical radiation "is one which is selectively absorbed by the follicles."  Such a wavelength, and the concept of selective absorption, are described in the specification.

Column 7, lines 8-52, and Figure 4 of the '568 patent discuss choosing the wavelength of the irradiating field: "In general, in order to selectively heat the target regions, the wavelength of the irradiating field is chosen to match the absorption spectrum of melanin …; conversely, the wavelength is mismatched to the absorption spectra of compounds contained in the skin, such as water and hemoglobin."  (Plaintiffs' Appendix, Ex. 4, '568 patent, col. 7, ll. 15-21).

Because the melanin is concentrated in the hair follicles, this wavelength will therefore be absorbed more readily by the hair follicles than by surrounding material (such as water and hemoglobin in blood in the skin), as well as other areas of the skin with less melanin.

The specification identifies ranges of wavelengths that will accomplish this: "Light having wavelengths between 680 and 1200 nm … is effectively absorbed by melanin while being relatively transmitted by both hemoglobin and water, and therefore can be used for selective heating of heavily pigmented hair surrounded by white skin …."  (Id., col. 7, ll. 22-26).

Candela's proposed construction has two problems.  First, it presumes that there is some wavelength that is effectively absorbed by hair follicles but not by the skin at all.  This is

- 21 -

probably a physical impossibility, as there will likely be some absorption by the skin at any

wavelength, as Figure 4 indicates.  The task of creating a selective absorption is one of

identifying wavelengths that follicles will absorb more readily than surrounding skin, not that

will not be absorbed by the skin at all.  Indeed, in light of Figure 4 showing many preferred

wavelengths that will be absorbed somewhat both by melanin and other material in the skin (but

more readily by the melanin concentrated in follicles), Candela's proposed construction would

likely not read on any embodiment described in the patent.  <u>See</u> <u>Vitronics Corp. v. Conceptronic</u>

<u>Inc..</u>, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (a construction that does not read on a preferred

embodiment is "rarely, if ever, correct").

    The second problem with Candela's proposed construction is that it is technically

nonsensical.  Hair follicles are part of the skin, not things distinct from skin.  The selective

absorption the patent describes is that of follicles relative to surrounding material in the skin

(e.g., water and hemoglobin) and not to skin <u>per</u> <u>se</u>.

**V.    CONCLUSION**

- 22 -

For the foregoing reasons, Palomar and MGH respectfully request that the Court construe the claim terms above as Palomar and MGH have proposed in the attached claim construction statement.

Respectfully submitted,

PALOMAR MEDICAL TECHNOLOGIES, INC. and THE GENERAL HOSPITAL CORPORATION,

By their attorneys,

/s/ Kate Saxton_____
Wayne L. Stoner (BBO # 548015)
Vinita Ferrera (BBO # 631190)
Kate Saxton (BBO # 655903)
Lawrence P. Cogswell (BBO # 664386)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts  02109
(617) 526-6000
(617) 526-5000

DATED:  May 29, 2007

- 23 -

### Certificate of Service

I, Kate Saxton, hereby certify that a copy of the foregoing document has been served upon all opposing counsel of record, by ECF, on this 29th day of May, 2007.

/s/ Kate Saxton
Kate Saxton

- 24 -