# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
                                   )

PALOMAR MEDICAL             )
TECHNOLOGIES, INC.,         )
                                   )

    Plaintiff and counter-defendant,   )     Civil Action No. 1:06-cv-11400 RWZ
                                   )

              v.                  )     **<u>ORAL ARGUMENT REQUESTED</u>**
                                   )

CANDELA CORPORATION,       )
                                   )

    Defendant and counter-claimant.   )
                                   )
_____)

## CANDELA'S OPENING MEMORANDUM IN SUPPORT OF
## <u>ITS PROPOSED CLAIM CONSTRUCTION</u>

TABLE OF CONTENTS

Page

I.     PRELIMINARY STATEMENT ........................................................................................1
       Nature Of The Claimed Invention ...............................................................................1
       The Disputed Terms and Proposed Constructions ........................................................1

II.    THE GOVERNING LAW OF CLAIM CONSTRUCTION ..........................................3

III.   THE DISPUTED TERMS OF THE '844 PATENT ........................................................4

       A.    "Applicator"..................................................................................................4
       B.    "Applying optical radiation . . . through said applicator to said skin
             region"........................................................................................................10
       C.    "Pressure being applied . . . to deform the skin region thereunder" ...................13
       D.    "Adapted to be in pressure contact with a portion of the skin surface . . . in
             said skin region" .........................................................................................15
       E.    "The optical radiation being passed through the applicator to said skin
             region"........................................................................................................17
       F.    "Element" ...................................................................................................17

IV.    THE DISPUTED TERMS OF THE '568 PATENT ......................................................19

       A.    "Wavelength . . . is selectively absorbed by the follicles" ...................................19

V.     CONCLUSION .............................................................................................................20

TABLE OF AUTHORITIES

Page(s)

**CASES**

*Anderson Corp. v. Fiber Composites, LLC*,
    474 F.3d 1361 (Fed. Cir. 2007)................................................................... 8

*Aquatex Industrial, Inc. v.  Techniche Solutions*,
    419 F.3d 1374 (Fed. Cir. 2005)................................................... 8

*Boston Scientific Corp. v. Cordis Corp.*,
    2006 U.S. Dist. LEXIS 94329 (N.D. Cal. Dec. 20, 2006)........................... 16

*CCS Fitness, Inc. v. Brunswick Corp.*,
    288 F.3d 1359 (Fed. Cir. 2002)................................................... 3

*Hockerson-Halberstadt, Inc. v. Converse, Inc.*,
    183 F.3d 1369 (Fed. Cir. 1999)................................................... 11

*Honeywell, International, Inc. v. ITT Industrial, Inc.*,
    452 F.3d 1312 (Fed. Cir. 2006)................................................... 6

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)........................... 3

*Mattox v. Infotopia, Inc.*,
    136 Fed. Appx. 366 (Fed. Cir. 2005)........................................... 15

*Nystrom v. Trex Co.*,
    424 F.3d 1136 (Fed. Cir. 2005)................................................... 8, 9

*Palomar Medical Technologies v. Cutera, Inc.*,
    C.A. No.: 02-10258 ................................................... 2, 4, 19

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)................................................... 2, 3, 4, 9

*Scimed Life System, Inc. v. Advanced Cardiovascular System, Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001)................................................... 5

*Texas Digital System, Inc. v. Telegenix, Inc.*,
    308 F.3d 1193 (Fed. Cir. 2002)................................................... 4

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)................................................... 4

Page(s)

*Warner-Lambert Co. v. Teva Pharmaceuticals USA, Inc.,*
    418 F.3d 1326 (Fed. Cir. 2005)..................................................................   8

## I.       PRELIMINARY STATEMENT

Candela Corporation ("Candela") respectfully submits this memorandum to address the construction of certain terms of the asserted claims of U.S. Patent Nos. 5,735,844 (Ex. 1) and 5,595,568 (Ex. 2) (referred to herein as the '844 and '568 patents, or collectively as "the patents-in-suit").

### Nature Of The Claimed Invention

The claimed inventions in this case concern the use of optical radiation, including lasers, to remove hair from the skin.  Laser skin treatment is an old technology dating back to the 1960's.  (See Ex. 3; Col. 1:10-11).  Laser hair removal was also not new at the time the patents-in-suit were filed.  For example, U.S. Pat. Nos. 4,388,924 and 5,226,907, discussed in the Background section of the '844 patent, describe methods of removing hair from skin using lasers.  (*See* Ex. 1; Col. 1:24-37).  To distinguish their invention from the prior art, the patentees pointed to a need for a technique that delivers optical radiation to the hair follicles in a skin region while minimizing damage to the skin.  (*Id.* at Col. 1:66-2:4).  "The technique involves placing an applicator in contact with the skin surface in the skin region and applying optical radiation . . . to the skin region for a predetermined time interval."  (*Id.* at Col. 2:10-15).

### The Disputed Terms and Proposed Constructions

Plaintiff Palomar Medical Technologies, Inc. ("Palomar")[1] has proposed broad constructions of the disputed terms that extend the scope of its claims beyond what the specification describes as the invention, and in the case of the term "applicator," attempts

---

[1] Palomar has filed a motion to join The General Hospital Corporation ("MGH") as a plaintiff in this action.  (See Docket Entry No. 19-1).  MGH has endorsed Palomar's proposed constructions of the disputed claim terms.  (See Docket Entry No. 31-1 ).

to recapture what the specification explicitly states is not included.  In contrast, Candela's proposed constructions are thoroughly supported by the intrinsic evidence.

This Court addressed claim construction issues for the '844 patent in *Palomar Medical Technologies v. Cutera, Inc.*, C.A. No.: 02-10258 (RWZ), a prior case where the defendant Candela was not a party.  Candela is of course not bound by those earlier constructions, and believes there are significant reasons why certain aspects of those constructions should be modified.  For example, the parties to that case overlooked and did not bring to the Court's attention statements in the specification which specifically exclude from the definition of "applicator" devices which Palomar now tries to capture through a broad definition of that term.  Moreover, the Court did not have the benefit of the *en banc* Federal Circuit decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) when it issued the *Cutera* claim construction opinion.

The terms that are in dispute and Candela's proposed constructions are set out in the chart below, and will be addressed in this memorandum.

| Claim Terms | Candela's Proposed Construction |
|---|---|
| Applicator ('844 claims 1, 3, 12, 17, 27, 28) | A device for transmitting optical radiation by contact with an area of the skin from which a plurality of hairs are to be simultaneously removed.  By disclaimer in the patent specification, an applicator is not a device that cools the skin cryogenically |
| Applying optical radiation . . . through said applicator to said skin region ('844 claims 1, 12, 17) | Applying optical radiation through the surface of the applicator that is in contact with the skin surface to the area of skin from which a plurality of hairs are to be simultaneously removed |
| Pressure being applied to the applicator . . . so as to cause the applicator to deform the skin region thereunder ('844 claim 12) | Pressure being applied to the applicator so as to cause the applicator to press down on the entire area of skin from which a plurality of hairs are to be simultaneously removed |
| Adapted to be in pressure contact with a portion of the skin surface . . . in said skin region ('844 claim 27) | Fit for (i.e., constructed for) pressing down on a portion of the skin surface from which a plurality of hairs are to be simultaneously removed |

| The optical radiation being passed through the applicator to said skin region ('844 claim 27) | Passing optical radiation through the surface of the applicator that is in contact with the portion of the skin surface from which a plurality of hairs are to be simultaneously removed |
| --- | --- |
| Element ('844 claim 32) | A device or component of a device for converging optical radiation as it enters the skin |
| Wavelength . . . is selectively absorbed by the follicles ('568 claim 8) | A wavelength that is effectively absorbed by hair follicles and not by the skin |

## II.   THE GOVERNING LAW OF CLAIM CONSTRUCTION

Claim construction is an issue of law.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).  While there have been numerous Federal Circuit cases since *Markman* addressing the standards for construing a claim, the Federal Circuit's *en banc* decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), provides an encyclopedic statement of the current law.

Under *Phillips*, a claim term is interpreted according to how it would have been understood by a person of ordinary skill in the art at the time of the invention.  *Id*. at 1313. The understanding of a person of ordinary skill is not considered in the abstract, but rather in the context of the patent specification and file history.  The Federal Circuit stated:

> Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.

*Id*. at 1313.

A court should also look for special definitions of a term and disclaimers in the specification:

> [T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.  In such cases, the inventor's lexicography governs.  *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002).  In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor.  In that instance as well, the inventor has dictated the

correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive.

*Id.* at 1316. "Thus the court starts the decision making process by reviewing the same resources as would that person, *viz.*, the patent specification and the prosecution history." *Id.*; *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("Usually [the specification] is dispositive; it is the single best guide to the meaning of a disputed term."). *Phillips* also rejected an approach to claim construction set forth in *Texas Digital Sys. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that gives claim terms the full scope of their dictionary definition absent a disavowal of that construction in the specification. *Phillips* at 1320.

## III.     THE DISPUTED TERMS OF THE '844 PATENT

### A.     "Applicator"

Candela's proposed construction of the term "Applicator" is: *a device for transmitting optical radiation by contact with an area of the skin from which a plurality of hairs are to be simultaneously removed. <u>By disclaimer in the patent specification, an applicator is not a device that cools the skin cryogenically</u>.*

Palomar argues for the construction of "applicator" accepted by this Court in *Palomar Medical Technologies v. Cutera, Inc.*, C.A. No.: 02-10258 (RWZ) — "a device for applying optical radiation." Of course Candela, as a third party, is not bound by the *Markman* decision in that case, and respectfully seeks a new construction. In *Cutera*, neither party brought a disclaimer of Palomar's construction to the Court's attention. Moreover, the *Cutera* claim construction opinion issued before the Federal Circuit's decision in *Phillips* which reaffirmed the primacy of the specification over dictionary definitions of a term.

As discussed in detail below, the '844 patent specification describes the claimed "applicator" as a device that transmits optical radiation by contact with the skin and that cools the skin (if at all) by contact.  (*See, e.g.,* Ex. 1, Col. 2:6-29).  To leave no doubt that an applicator is a device for applying optical radiation and cooling by contact, the patentees described applying radiation and cooling the skin WITHOUT an applicator:

> For example,  . . . cooling of the epidermis may be performed *without an applicator* (for example cryogenically). *Where an applicator is not utilized,* radiation is applied directly to the region of interest after passing through the appropriate optics.

(Ex. 1; Col. 15:43-47; emphasis added).

In light of this statement, an applicator cannot mean *all* devices for applying optical radiation (as Palomar contends) because the specification expressly describes applying radiation to the skin without an "applicator."  The specification tells the person of ordinary skill in the art that one is not using an applicator if radiation is applied directly to the skin after passing through optics.  An "applicator" as that term is used in the patent, is also not used when cooling is done cryogenically – *e.g.*, by non-contact spraying a very low temperature coolant on to the skin.[2]

These exclusionary statements must be taken into account when construing a claim. *See Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1342 (Fed. Cir. 2001) (finding that the specification defined the invention in a way that excluded a dual, or side by side, lumen arrangement).  Analogous statements excluding particular

---

[2] *See* Ex. 4; A.J. Welch *et al.*, "Evaluation of Cooling Techniques for the Protection of the Epidermis During ND-YAG Laser Irradiation of the Skin," Neodymium-YAG Lasers in Medicine, pp. 196-204 at 199 (1983) ("The nozzle of the freon was kept at 8 to 16 centimeters away from the skin depending on laser irradiation time.")(cited on p. 2 of the '844 patent); *see also* Ex. 5; B. Anvari *et al.*, "A theoretical study of the thermal response of skin to cryogen spray cooling and pulsed irradiation: implications for treatment of port wine stain birthmarks" Phys. Med. Biol. 40 (1995) 1451-65 at 1451.

embodiments from a claim term which might have been read to include them were considered by the Federal Circuit in *Honeywell, Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312 (Fed. Cir. 2006). In that case, the patentee told readers of its patent why carbon filters would not be suitable as "electrically conductive fibers" in the claimed invention. The court explained that:

> If the written description could talk, it would say, "Do not use carbon fibers." There is no other way to interpret the written description's listing of all the reasons that metal fibers fare better than carbon fibers . . .

*Id.* at 1320. Based in part on that disavowal of subject matter, the court reversed the district court's broad interpretation of the term "electrically conductive fibers" to the extent it encompassed carbon fibers. *Id.* at 1319.

The specification of the '844 patent has also spoken. A person of ordinary skill in the art would understand from the passage cited above that: (1) an applicator is not *any* device for applying optical radiation to the skin; (2) when radiation is applied directly to the skin (rather than through a device in contact with the skin) "an applicator is not utilized"; and (3) an applicator is not a device that cools the skin cryogenically.

In addition to its description of what is *not* an applicator, the specification makes clear that the term applicator refers to a device for transmitting optical radiation by contact with an area of the skin from which a plurality of hairs are to be simultaneously removed. First, the Summary Of The Invention describes the applicator in this manner:

> [T]his invention provides a method and apparatus for the simultaneous removal of a plurality of hairs from a skin region, each of which is in a follicle extending into the skin from the skin surface. The technique involves <u>placing an applicator in contact with the skin surface in the skin region and applying optical radiation</u> . . .

(Ex. 1; Col. 2:6-11; emphasis added).

Second, Figure 2A of the '844 patent — a cross sectional view of an applicator suitable for hair removal — also shows a device transmitting optical radiation by contact with the area of the skin from which a plurality of hairs are to be simultaneously removed:



FIG.2A

Again, in the Mechanical Structure section of the '844 patent, the applicator transmits a beam of radiation through a "lens or contact device 46 which is placed in contact with the skin region 20." (Ex. 1; Col. 5:38-40). Even as to the alternative embodiment depicted in Figure 10B, the applicator includes a contact device in contact with the skin. (Ex. 1; Fig. 10B and Col. 14:55-60). Indeed, <u>each and every disclosure</u> of an "applicator" in the '844 patent includes transmitting optical radiation <u>by contact</u> with an area of the skin from which a plurality of hairs are to be simultaneously removed.

Using the "applicator" to cool the skin by "contact with the skin surface" is also described in the written description of the '844 patent. (Ex. 1; Col. 2:28-30). The "thermal properties of the contact device are chosen to allow efficient coupling of heat from the skin region." (*Id.* Col. 5:43-45). No method of cooling the skin using an applicator that is *not* in contact with the skin is described in the '844 patent. In fact, when a non-contact method of cooling is described, *i.e.*, to spray cryogen at a distance, the patent explicitly states that this method <u>does not</u> employ an applicator.

The Federal Circuit in *Phillips* confirmed that a disputed claim term should be construed according to its use in the patent specification. *See Phillips* at 1313; *see also*, *Warner-Lambert Co. v. Teva Pharmaceuticals USA, Inc.*, 418 F.3d 1326, 1340 (Fed. Cir. 2005) (affirming decision that the term "discoloration" meant "oxidative discoloration" due to its consistent use in that manner in the specification); *Nystrom v. Trex Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005) (limiting the term "board" to wood cut from a log); *Aquatex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1382 (Fed. Cir. 2005) (disputed claim term "fiberfill" was limited to synthetic fibers). So too in this case, the term "applicator" should be given its plain meaning in light of its description in the specification of the '844 patent, a device for transmitting optical radiation by contact with an area of the skin from which a plurality of hairs are to be simultaneously removed.

Palomar may argue, as it has in the past, that Candela seeks to limit the claims to particular embodiments described in the specification, but that is plainly not the case. The question before the Court is what the term "applicator" means in light of the specification, and using the specification to assist in determining the meaning is not adding limitations to the claim. The portions of the specification cited above tell the reader what an applicator is and what it is not. They are not descriptions of particular embodiments, but describe the claimed "applicator" as a whole. *See Anderson Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1367 (Fed. Cir. 2007) ("[Statements from the specification] are not descriptions of particular embodiments, but are characterizations directed to the invention as a whole."). They make clear that the term "applicator" does not encompass broader subject matter.

Palomar may also argue, as its counsel did during the Cutera *Markman* hearing, that the ordinary meaning of a term is determined by looking in a dictionary:

> [T]he rule basically says unless there is an express intent in the specification to give a claim term a different meaning, the plain meaning of the term applies, and that plain meaning is to be determined by looking in a dictionary.

(Ex. 6, p. 10). The Federal Circuit rejected this very approach in its *en banc* decision in *Phillips*. *See Phillips*, 415 F.3d at 1320-21 (finding that limiting the role of the patent specification to a check on the dictionary definition was an improper approach to claim construction.). What *Phillips* now teaches is that:

> [I]n the absence of something in the written description and/or prosecution history to provide implicit or explicit notice to the public -- i.e., those of ordinary skill in the art -- that the inventor intended a disputed term to cover more than the ordinary and customary meaning revealed by context of the intrinsic record, it is improper to read the term to encompass a broader definition simply because it may be found in a dictionary, treatise, or other extrinsic source.

*Nystrom*, 424 F.3d at 1144. Thus, Palomar's broad construction based on dictionary definitions has no merit.[3]

Moreover, there *was* indeed a clear disavowal of Palomar's broad interpretation of "applicator" (i.e., all devices for applying optical radiation). As described above, the written description of the '844 patent makes a clear distinction between use of the claimed "applicator" in contact with the skin and other hair removal and cooling techniques that <u>do</u>

---

[3] As *Philips* points out, one problem with dictionary definitions is that there are usually several definitions that in theory could apply depending on the context. *Phillips* at 1321. One cannot look to the dictionary alone to resolve which particular definition should apply. Here, for example, the online Merriam Webster definitions of applicator is "a device for applying a substance (as medicine or polish)." *See* Ex. 7 *http://www.m-w.com/cgi-bin/dictionary?book =Dictionary&va=applicator* (visited 5/23/07). This definition describes a contact instrument, like a brush that spreads or lays on a substance. It is not particularly instructive in a vacuum. But in view of the intrinsic evidence, its supports a construction of "applicator" meaning a device that applies radiation by contact with the skin.

not utilize an applicator.  (Ex. 1; Col. 15:41-47).  Accordingly, Palomar's reliance on broad

dictionary definitions has no merit for this additional reason.

Candela's construction of "applicator" is also supported by the prosecution history

of the '844 patent.  Following an interview with the patentee's attorney on July 21, 1997,

the Examiner issued a Notice of Allowability.  The Examiner stated the following "reasons

for allowance" :

> The present invention distinguishes over the prior art of record in that the
> prior art fails to teach or show an optical <u>contact device</u> for the removal of a
> plurality of hairs simultaneously via laser irradiation.

(Ex. 8; "Examiner's Amendment," p. 3)(emphasis added).  This demonstrates that the

Examiner also understood the claimed invention to require transmitting optical radiation by

contact with — and not from a distance to — an area of the skin from which a plurality of

hairs are to be simultaneously removed.

> **B.      "Applying optical radiation . . . through said applicator to said skin
> region"**

Candela's proposed construction of this term is: *applying optical radiation <u>through</u>*

*<u>the surface of</u> the applicator that is in contact with the skin surface to the area of skin from*

*which a plurality of hairs are to be simultaneously removed.*

Candela's construction is supported by the written description of applying optical

radiation "through said applicator" in the '844 patent:

> The technique involves placing an applicator <u>in contact with the skin</u>
> <u>surface</u> in the skin region and applying optical radiation of a selected
> wavelength and of a selected flux through the applicator to said skin region
> for a predetermined time interval.

(Ex. 1; Col. 2:10-14) (emphasis added).  The applicator is placed in contact with the

portion of the skin surface from which hair will be removed.  Because the applicator is not

moved before the optical radiation is applied to the skin, the optical radiation must be

applied "through" the applicator in contact with the skin:

> After passing through this optic, the beam then impinges on a lens or
> contact device 46 <u>which is placed in contact</u> with the skin region 20.  The
> optical and mechanical properties of the contact device 46 are chosen to
> allow efficient coupling of the optical radiation into the skin region . . .

(Ex. 1; Col. 5:38-41) (emphasis added).

The examples in the '844 patent also describe passing optical radiation through the

surface of the applicator that is placed in contact with the area of skin from which a

plurality of hairs are to be simultaneously removed.  (Ex. 1; Col. 12:52-56).  There is no

other method of applying optical radiation through the applicator in contact with the skin

surface described in the '844 patent.  Accordingly, the written description of the '844

supports Candela's construction of this term.

Candela's construction is also supported by the way the disputed phrase is used in

the context of the claims as a whole.  *See Hockerson-Halberstadt, Inc. v. Converse, Inc.*,

183 F.3d 1369, 1374 (Fed. Cir. 1999) ("Proper claim construction, however, demands

interpretation of the entire claim in context, not a single element in isolation").  For

example, claim 1 reads in relevant part as follows:

> A method for the simultaneous removal of a plurality of hairs from a skin
> region, each hair being in a follicle extending into the skin from a skin
> surface, the method comprising the steps of:
>
> (a) placing *an applicator in contact with the skin surface in said skin
> region*;
>
> (b) **applying optical radiation** of a selected wavelength and of a selected
> fluence **through *said applicator* to said skin region**, said applying step
> lasting for a predetermined time interval; and
>
> (c) utilizing said applicator at least during step (b) to cool the skin surface in
> said skin region to a selected depth;
> * * *

11

(Ex. 1, Col. 15:53-65).  As shown, the disputed term (in bold) requires applying optical radiation through "said applicator" to said skin region.  In order to have an antecedent basis, the words "said applicator" in step (b) must refer to the applicator from step (a) — the only applicator previously mentioned in the claim.

The applicator in step (a) "is in contact with the skin surface in *said skin region*." "Said skin region" means the region of skin from which a plurality of hairs are to be simultaneously removed referred to earlier in the claim.[4]  Thus, the applicator in step (a) is necessarily in contact with the skin surface in the area from which the plurality of hairs will be removed.

Similarly, step (c) of claim 1 requires "utilizing said applicator at least during step (b) to cool the skin surface in said skin region." (emphasis added).  The '844 patent teaches that an applicator cools the skin by contact with the area of skin from which hair is being removed.  (*See, e.g.,* Ex. 1; Col. 7:44-65).  No other method of using an "applicator" to cool the skin during the transmission of optical radiation was taught in the '844 patent. Moreover, the written description specifically states that using cryogen to spray cool the skin is not use of an "applicator."  Thus, a person of ordinary skill would understand that optical radiation must pass through the surface of the applicator in contact with the skin for the additional reason that the applicator must be in contact with the skin at the place where the radiation is applied in order to cool the skin.

Palomar's proposed construction of this term is: *applying optical radiation through the applicator that is in contact with the skin surface to the area of skin from which a plurality of hairs is to be simultaneously removed.*  Notably, Palomar's construction

---

[4] This Court reached the same conclusion with respect to the meaning of the term "in *said skin region*" in claim 12.  (*See* Ex. 9; Memorandum Decision and Order, p. 3).

requires that the applicator be in contact with the skin surface during the application of optical radiation, but apparently Palomar contends that radiation can be emitted from a part of the applicator that is not in contact with the area of skin from which the hairs are to be removed.

Palomar's construction not only conflicts with the written description of the invention, it does not fit the words actually used in the claim.  The applicator must be in contact with the area of skin from which a plurality of hairs are to be simultaneously removed when the claim is read as a whole.  The applicator in step (a) is "in contact with the skin surface in said skin region."  (See Step (a) above).  As discussed above, "said skin region" means the area of skin from which a plurality of hairs are to be simultaneously removed.  Thus, not only must the applicator be in contact with the skin surface during the application of optical radiation, it must also be in contact with the area of skin from which a plurality of hairs are to be simultaneously removed.  That being so, the radiation must pass through the surface of the applicator in contact with the skin.

C.      **"Pressure being applied . . . to deform the skin region thereunder"**

Candela's proposed construction of this term is: *pressure being applied to the applicator so as to cause the applicator <u>to press down on the entire area of skin from which a plurality of hairs are to be simultaneously removed</u>.*

Claim 12 reads as follows:

A method for the simultaneous removal of a plurality of hairs from a skin region, each hair being in a follicle extending into the skin from a skin surface, the method comprising the steps of:

(a) placing an applicator in contact with the skin surface in said skin region; and

(b) applying optical radiation of a selected wavelength and of a selected fluence through said applicator to said skin region, said applying step

13

> lasting for a predetermined time interval;
>
> **pressure being applied** to the applicator during steps (a) and (b) so as to cause the applicator **to deform the skin region thereunder**.

(Ex. 1; Col. 16:47-60).  As shown in bold, this term refers to applying pressure to the applicator during steps (a) (placing the applicator in contact with the skin) and (b) (applying optical radiation) of claim 12.  Steps (a) and (b) of claim 12 are identical to steps (a) and (b) of claim 1, which are discussed above.  For the same reasons discussed above as to claim 1, the applicator in claim 12 must be in contact with the area of skin from which a plurality of hairs are to be simultaneously removed during steps (a) and (b).  Accordingly, applying pressure to the applicator during steps (a) and (b) will cause the applicator to press down on the entire area of skin from which a plurality of hairs are to be simultaneously removed.

Moreover, the purpose of applying pressure to the skin, as described in the specification, is accomplished only under Candela's construction and not Palomar's broader construction, which allows for applying pressure on any region of skin regardless of whether the area being pressed down is where the hairs are being removed.  The specification states that pressure (1) decreases the distance through the skin that the laser must travel to reach the follicle, (2) removes laser light absorbing blood from the skin where the hair is being removed, and (3) couples the optical radiation from the applicator to the skin.

> [A] contact device 46 having a convex shaped surface allows efficient compression of the skin during contact.  Compression of the dermis 58 located near the surface 62 of the contact device decreases the distance between this region and the papillae; . . . compression of the skin results in bringing more light to the deep portions of the hair follicles for more efficient light-induced heating of the papilla.  In addition, compression of the dermis by the contact device . . . forces light absorbing blood out of the irradiated region . . .

(Ex. 1; Col. 6:49-63).  Pressing the applicator against the skin also allows optical radiation to be coupled into and out of the epidermis, while allowing effective irradiation of the follicle targets in the dermis.  (Ex. 1; Col. 7:13-16).  There is no advantage to pressing down on any other portion of the skin surface described in the '844 patent or prior art cited during the prosecution of the patents-in-suit.

Moreover, Figure 2A above, as well as Figures 2B and 3A, also show an applicator pressing down on the area of skin from which a plurality of hairs are to be simultaneously removed.  For all the foregoing reasons, a person of ordinary skill in the art would understand that this term requires pressing down on the entire area of skin from which hair will be removed.

### D.    "Adapted to be in pressure contact with a portion of the skin surface . . . in said skin region"

Candela's proposed construction of this term is: *fit for (i.e., constructed for) pressing down on a portion of the skin surface from which a plurality of hairs are to be simultaneously removed.*

"Adapt" means to "[to] fit, adjust (one thing to another)" or "[to] make suitable for a purpose."  (Ex. 10; The Oxford Encyclopedic English Dictionary, 2d ed. 1995); *see also Mattox v. Infotopia, Inc.*, 136 Fed. Appx. 366, 368 (Fed. Cir. 2005) ("The term 'adapted' plainly means to make fit (as for a specific or new use or situation)")(non-precedential); *Boston Scientific Corp. v. Cordis Corp.*, 2006 U.S. Dist. LEXIS 94329, at *6 (N.D. Cal. Dec. 20, 2006) ("to make suitable to a specific use or situation" citing American Heritage Dictionary 15 (3d ed. 1993)).  Accordingly, this term requires an apparatus fit for (ie, constructed for) being in pressure contact with the portion of the skin surface containing a plurality of hairs in said skin region.

It is not sufficient that the claimed apparatus be constructed for pressing down on the skin surface at a place other than the area from which the hairs are being removed.  The disputed claim, No. 27, requires an apparatus adapted to be in pressure contact with a portion of the skin surface "containing a plurality of hairs in said skin region."  (Ex. 1; Col. 18:42-44).  The phrase "a portion of the skin surface" modifies the term that immediately follows "containing a plurality of hairs."  Thus, the applicator must be adapted to be in pressure contact with a portion of the skin surface containing a plurality of hairs.  "Said skin region," as discussed above, refers to the region of skin from which a plurality of hairs are to be simultaneously removed.  Accordingly, the applicator must be adapted to press down on a portion of the skin surface containing a plurality of hairs that are to be removed.

The specification of the '844 patent also supports Candela's construction.  As discussed above, an apparatus adapted to press down on a portion of the skin surface from which a plurality of hairs are to be simultaneously removed will assist in reducing the distance between the surface of the skin and the target, remove blood from the area of skin to be treated and improve the coupling of optical radiation to the skin.  Meanwhile, there is no advantage to pressing down on any other portion of the skin surface described in the '844 patent.

The prosecution history of the '844 patent also supports Candela's construction.  Claim 27 as originally drafted required an applicator "adapted to be in contact with the skin surface in said skin region."  (Filed as Claim 30; *See* Ex. 11, p. 26).  Following a rejection and interview with the Examiner, claim 27 was amended to its current phrasing "an applicator which is adapted to be in <u>pressure</u> contact with <u>a portion of</u> the skin surface <u>containing a plurality of hairs</u> in said skin region" in order to put the claim in condition for

allowance.  (*See* amendment to original Claim 30; Ex. 8 "Examiner's Amendment," p. 2). This underscores the fact that the disputed term requires pressing down on a portion of the skin surface from which a plurality of hairs are to be simultaneously removed.

      **E.**      **"The optical radiation being passed through the applicator to said skin region"**

      Candela's proposed construction of this term is: *passing optical radiation through the surface of the applicator that is in contact with the portion of the skin surface from which a plurality of hairs are to be simultaneously removed.*  Support for this construction is discussed above with respect to the disputed term "applying optical radiation . . . through said applicator to said skin region."

      **F.**      **"Element"**

      The Court's prior construction of "*element*" was: "a device or component of a device for converging optical radiation."  (*See* Ex. 9; Memorandum of Decision and Order at 4).  Candela seeks a clarification of that construction that "element" means *a device or component of a device for converging optical radiation <u>as it enters the skin</u>*.  This construction is supported by the ordinary meaning of this phrase in view of the specification and prosecution history of the '844 patent.

      The specification of the '844 patent describes adjusting properties of the optical field "inside the skin" to optimize the hair removal process.  (Ex. 1; Col. 8:16-20). "[B]eam convergence as it enters the skin" is listed among the optical properties that can be adjusted.  (Ex. 1; Col. 8:24-25).  The claimed "element" converges optical radiation as it leaves the applicator through the surface in contact with the skin:

          An applicator suitable for use in practicing hair removal in accordance with the above may include an inlet through which optical radiation is applied to the applicator, a surface shaped to contact the skin surface in said skin

> region, . . .an element in the optical path for converging the optical radiation
> as it leaves the applicator through the surface . . .

(Ex. 1; Col. 3:17-25). Optical radiation leaves the applicator described above through a

surface "shaped to contact the skin surface." (Ex. 1; Col. 3:19-20). Thus, optical radiation

that converges as it leaves the device will also be converging as it enters the skin.

According to the '844 patent specification, converging the light as it enters the skin

allows the light field to simultaneously irradiate various target portions of the hair follicle.

(Ex. 1; Col. 6:17-20). It is further explained that:

> After passing through the contact device 46, the light field 38 is preferably
> converged through the epidermis 56 of the skin layer (having a thickness,
> e.g., of about 0.1 mm) and is condensed in the dermis 58 near the papillae
> 54 of the follicles 40.

(Ex. 1; Col. 6:23-27).

More techniques for providing "a convergent field entering the skin" are disclosed

in the Mechanical Structure section of the specification. (Ex. 1; Col. 7:40-41). Fig. 3A

shows a device for converging optical radiation as it enters the skin. Similarly, Table 1 of

the '844 patent lists a range of optical field parameters, along with preferred values:

### TABLE 1

| Preferred Optical Field Parameters | | |
|---|---|---|
| Parameter | Range | Preferred Values |
| Wavelength | 680–1200 nm | 680–900, 1000–1200 nm |
| Pulse Duration | 50 $\mu$s–200 ms | 2–100 ms |
| Beam Area | >0.5 cm$^2$ | 0.75–1.0 cm$^2$ |
| Pulse Energy | 10–200 J/cm$^2$ | 30–50 J/cm$^2$ |
| Optical Coupling | external n $\geqq$ 1.4 | n = 1.5 to 1.7 |
| Beam Convergence, At Skin Surface | collimated or convergent | f# 0.5–2 |

(Ex. 1; Col. 12:5-15). As shown, beam convergence values are reported "at [the] skin

surface." Converging optical radiation to a focal point outside the skin is not described in

18

the '844 patent, and no benefit to converging optical radiation before it enters the skin is discussed.  Accordingly, a person of ordinary skill in the art would understand that an "element," within the meaning of claim 32, is a device or component of a device for converging optical radiation as it enters the skin.

## IV.     THE DISPUTED TERMS OF THE '568 PATENT

The '568 patent is an earlier filed patent, to which the '844 patent claims priority. Construction of the '568 patent claims was not considered by this Court in connection with *Palomar Medical Technologies, Inc. v. Cutera, Inc.*, C.A. No. 02-10258 (RWZ).  One term of the '568 patent is in dispute.  Candela's proposed construction is discussed below.

### A.     "Wavelength . . . is selectively absorbed by the follicles"

Candela's proposed construction of this term is: *a wavelength that is effectively absorbed by hair follicles and not by the skin.*

This construction is supported by the '568 patent specification.  It states that "the wavelength of optical radiation is chosen to be selectively absorbed by hair follicles, . . ." (Ex. 2, Col. 1:66-67).  Furthermore, "the light field supplied to . . . the irradiating unit 18 is designed to maximize the amount of light induced heat deposited in the hair follicle, while reducing the degree of injury to the surrounding skin."  (Ex. 2, Col. 4:4-9).  "Light having wavelengths between 680 and 1200 nm, . . . is effectively absorbed by melanin while being relatively transmitted by both hemoglobin and water, and therefore can be used for selective heating of heavily pigmented hair surrounded by white skin."  (*Id.* Col. 7:21-26).

Palomar's proposed construction of this term is "a wavelength that is absorbed more readily by the follicles than surrounding material."  This construction would cover any wavelengths absorbed more by the hair follicle than by surrounding material, even if the difference in absorption was slight.  Palomar's construction is contradicted by the

intrinsic record.  For example, Figure 4 depicts a range (indicated by arrow 70) that selectively heats pigmented hair surrounded by white or lightly tanned skin.  (Ex. 2, Col. 7:21-26).  Not all wavelengths absorbed more by hair than by surrounding skin material fall within this range.  (Ex. 2, Fig. 4).  Accordingly, all wavelengths more readily absorbed by the hair than surrounding material are not *per se* "selectively absorbed."

Moreover, Palomar's construction does not serve the purpose of selective absorption described in the '568 patent.  Selective absorption permits the hair follicle to be destroyed or damaged without damaging the surrounding skin.  (Ex. 2, Col. 4:4-9).  A wavelength that is absorbed more by hair than by skin could still damage both if the difference in absorption was small.  The point of the claim element is to select wavelengths readily absorbed by the hair follicle, that are not absorbed significantly by the skin.

## V.     CONCLUSION

Based on the foregoing, Candela respectfully requests that the Court adopt Candela's proposed construction of the claim terms discussed above.

Dated:  May 29, 2007

CANDELA CORPORATION

By its Attorneys

_____/s/ Joan M. Griffin_____
Joan M. Griffin (BBO# 549522)
MCDERMOTT, WILL & EMERY LLP
28 State Street
Boston, MA  02109-1775
Tel.:  (617) 535-4000
Fax:  (617) 535-3800

and

Leora Ben-Ami (*pro hac vice*)
Thomas F. Fleming (*pro hac vice*)
Howard S. Suh (*pro hac vice*)

Gasper J. LaRosa (*pro hac vice*)
KAYE SCHOLER LLP
425 Park Avenue
New York, NY  10022
Tel:  (212) 836-8000

## CERTIFICATE OF SERVICE

I, Joan M. Griffin, counsel for Defendant and counter-claimant Candela Corporation, hereby certify that on May 29, 2007 a true copy of the above document was served upon counsel of record through the ECF system.

<u>/s/ Joan M. Griffin</u>
Joan M. Griffin

BST99 1542710-1.076900.0011