## UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PALOMAR MEDICAL TECHNOLOGIES, INC., and THE GENERAL HOSPITAL CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> CANDELA CORPORATION, <br><br> Defendant. | Civil Action No.  06-11400-RWZ |

### DEFENDANT CANDELA CORPORATION'S
### REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

CANDELA CORPORATION

*By its attorneys*,

Anthony L. Press (admitted *pro hac vice*)
Charles S. Barquist (admitted *pro hac vice*)
Jill D. Neiman (admitted *pro hac vice*)
Wendy J. Ray (admitted *pro hac vice*)
MORRISON & FOERSTER LLP
555 W. Fifth Street, Suite 3500
Los Angeles, California 90013
Ph:   (213) 892-5200

Joan M. Griffin (BBO #549522)
P.O. BOX 133
Dublin, New Hampshire 03444
Ph:   (617) 283-0954

Dated:  September 10, 2010

-

la-1089653

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................................... 1
II. SUMMARY JUDGMENT IN FAVOR OF CANDELA IS NOT PRECLUDED BY DEPOSITION TESTIMONY ................................................. 1
III. CANDELA DOES NOT INFRINGE ...................................................................... 1
    A. There is No Evidence that the Applicator Is Utilized to Cool During Irradiation; Claims 1-8 Are Therefore Not Infringed .................... 1
    B. Candela Is Entitled to Summary Judgment on Claims 1-8 And 19-20 Because Palomar Has Not Introduced Any Admissible Evidence of Cooling During Irradiation .................................................... 2
    C. Candela Is Entitled to Summary Judgment on Claims 1-8 And 19-20 Because Palomar Has Not Introduced Any Admissible Evidence of Cooling to a Selected Depth .................................................. 4
    D. Candela's Applicators Do Not Contact the Skin Surface in Said Skin Region And Thus Do Not Infringe Claims 1-8 and 27 ...................... 5
    E. Candela Does Not Infringe Claim 27 Because Its Devices Are Not Adapted to be in Pressure Contact with the Skin Region .......................... 6
    F. Candela Does Not Infringe Claim 32 Because Palomar Has Not Demonstrated that Candela's Lenses Are Used for Converging ................ 7
IV. CANDELA IS ENTITLED TO SUMMARY JUDGMENT OF INVALIDITY ON CLAIMS 27 AND 32 ........................................................... 7
    A. Candela's Invalidity Arguments Have Not Been Ruled on by the Court or the PTO ........................................................................................ 8
    B. Palomar Has Not Refuted Candela's Showing that Claim 27 is Invalid as Anticipated ................................................................................ 9
    C. Palomar Has Not Refuted Candela's Showing that Claim 32 Is Invalid as Anticipated .............................................................................. 11
    D. Palomar's Contention of No Anticipation Due to Alleged Skin Injury Fails .............................................................................................. 12
V. CONCLUSION ..................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bristol-Myers Squibb Co. v. Ben Venue Labs*,
    246 F.3d 1368 (Fed. Cir. 2001) ............................................................................................. 11

*Catalina Mktg. v. Coolsavings.com*,
    289 F.3d 801 (Fed. Cir. 2002) ............................................................................................... 12

*Celeritas Tech. v. Rockwell Int'l*,
    150 F.3d 1354 (Fed. Cir. 1998) ............................................................................................. 13

*Hayes v. Douglas Dynamics*,
    8 F.3d 88 (1st Cir. 1993) ......................................................................................................... 2

*In re Etter*,
    756 F.2d 852 (Fed. Cir. 1985) ................................................................................................. 8

*In re Schreiber*,
    128 F.3d 1473 (Fed. Cir. 1997) ............................................................................................. 10

*Laminations, Inc. v. Roma Direct Mktg. LLC*,
    516 F. Supp. 2d 404 (M.D. Pa. 2007) ..................................................................................... 5

*Liebel-Flarsheim Co. v. Medrad*,
    358 F.3d 898 (Fed. Cir. 2004) ............................................................................................... 13

*Mass Engineered Design, Inc. v. Ergotron, Inc.*,
    633 F. Supp. 2d 361 (E.D. Tex. 2009) .................................................................................. 11

*Rowe v. Dror*,
    112 F.3d 473 (Fed. Cir. 1997) ............................................................................................... 11

*Stevenson v. Sears, Roebuck & Co.*,
    713 F.2d 705 (Fed. Cir. 1983) ............................................................................................... 12

*Sultis v. General Motors Corp.*,
    690 F. Supp. 100 (D. Mass. 1988) .......................................................................................... 2

**I.     INTRODUCTION**

Rather than focusing on the merits, Palomar argues that Candela's motion is precluded by deposition testimony, or has already been decided in another case, or by the PTO during the reexamination.  These arguments are without basis.  When Palomar does address the merits, it makes overreaching and in many instances flatly erroneous statements to try to create disputed issues of fact.  Palomar has failed to produce admissible evidence sufficient to defeat summary judgment.  Candela's devices do not practice the claimed inventions.  And, as a matter of law, claims 27 and 32 are inherently anticipated by the Tanino reference.  Accordingly, summary judgment should be granted.

**II.    SUMMARY JUDGMENT IN FAVOR OF CANDELA IS NOT PRECLUDED BY DEPOSITION TESTIMONY**

Palomar's assertion that this motion is somehow precluded by the deposition testimony of a Candela corporate designee is plainly without merit.  As Palomar admits, the designated topics were the "*factual bases*" for Candela's non-infringement and invalidity contentions. (Petty Dec., Ex. 2 (emph. added).)  The questions cited by Palomar, however, called for ultimate legal conclusions on infringement and invalidity— questions that were simply beyond the scope of the topics and that the witness therefore had no duty to answer.  Moreover, Candela timely asserted objections to these topics to the extent they called for legal conclusions or expert testimony. (Supp. Ray Dec. Ex. 6.)

**III.   CANDELA DOES NOT INFRINGE**

**A.    There is No Evidence that the *Applicator* Is Utilized to Cool *During* Irradiation; Claims 1-8 Are Therefore Not Infringed**

Claims 1 through 8 require "*utilizing said applicator* at least during step (b) [irradiation] to cool . . . ." (emph. added.)  All of Palomar's arguments are directed to whether cryogen remains on the skin during irradiation, which is irrelevant to whether the applicator is utilized to cool during irradiation.[1]  Palomar does not offer any evidence to

---

[1] Palomar points to a sentence in the specification that mentions cryogen cooling.  Palomar fails to mention that this language was absent from the original application and was only added later, after the inventors became aware of others using cryogen cooling and attempted to patent things they hadn't invented. (Supp. Ray Dec. Ex. 10.)  The one passing mention of cryogen does not tie to anything in the patent, and there is no reason to believe that this aspect of an embodiment is captured by the claims at issue.

demonstrate that the cryogen system in the applicator is in operation (*i.e.*, is being utilized to cool) during irradiation. Indeed, Dr. Bass admitted that the DCD components in the applicator are inactive during irradiation (Bass Dep., Ray Dec. Ex. 2, at 99:23-100:10), and Palomar's Fact 25 confirms that there is at least a three millisecond delay between the use of the applicator to spray cryogen and the firing of the laser. Summary judgment should therefore be granted as to claims 1 through 8 for this reason alone.

> **B.  Candela Is Entitled to Summary Judgment on Claims 1-8 And 19-20 Because Palomar Has Not Introduced Any Admissible Evidence of Cooling During Irradiation**

Palomar claims that Candela cools during irradiation because it is theoretically possible with a large amount of cryogen and a short delay before the laser pulse for cryogen to remain on the skin (and thus cool it) during irradiation. Palomar, however, does not present *any* admissible evidence that Candela ever instructed its users to apply so much cryogen with such a short delay that cryogen could remain on the skin during irradiation. Indeed, Candela's treatment guidelines for hair removal recommend at most 60 ms of spray (far less than the maximum of 100 ms) and at least 30 ms of delay (far more than the minimum of 3 ms). (Supp. Hsia Dec. Exs. 1-3.)

Palomar relies primarily on the following testimony from Dr. Bass: "Based on my understanding of the way Candela's devices work, including my observation of the video [Ex. 47][2] . . ., cryogen continues to evaporate while the Candela laser is fired, and therefore the Candela devices therefore cool during irradiation." (Bass Dec. ¶ 14.) As discussed in Candela's motion to strike, Dr. Bass' testimony in this regard is conclusory and insufficient to defeat summary judgment. *Hayes v. Douglas Dynamics*, 8 F.3d 88, 92 (1st Cir. 1993) (To defeat summary judgment an expert opinion must be more than a conclusory assertion about ultimate legal issues; where an expert presents "nothing but conclusions—no facts, no hint of an inferential process, no discussion of hypotheses considered and rejected," such testimony will be insufficient); *Sultis v. General Motors*

---

[2] Palomar implies that Ex. 47 was produced late. Such is not the case; it was produced less than 30 days after Palomar served its subpoena to Dr. Rohrer.

la-1089653                                        2

*Corp.*, 690 F. Supp. 100, 103 (D. Mass. 1988) (evidentiary rules regarding expert testimony not intended to make summary judgment impossible whenever a party has produced an expert to support its position). Dr. Bass has operated one of the three accused devices only *once,* and the others not at all (Bass Dep., Supp. Ray Dec. Ex. 7, at 6:22-8:24); he therefore has no basis for his speculative, conclusory declaration.

Moreover, Dr. Bass does not state he observed cryogen on the skin during the laser firing when he used Candela's device.[3] Rather, he relies on the unauthenticated video. Had a witness been asked what it shows, Palomar would have learned that it does not show cryogen on the skin because cryogen is a clear liquid, not the white color seen on the video. (Supp. Hsia Dec. ¶ 6.) The white color is the result of condensation of atmospheric moisture, which appears white because it has been rapidly cooled by the cold skin, which was previously cooled by the cryogen. (*Id.*) Thus, Dr. Bass does not establish that cryogen remains on the skin during irradiation.

With little else on which to rely, Palomar points to the '040 patent for its assertion that heat is removed during laser irradiation. Dr. Rohrer used graphs from a presentation of the inventor of the '040 to illustrate the heating that immediately occurs upon the laser firing; he had never seen the patent and did not testify that the patent describes how Candela's DCD works. (Rohrer Dec., Supp. Ray Dec. Ex. 8, at 123:13-23.) Palomar does not introduce any evidence that the portions of the '040 it cites are practiced by Candela. Just because the patent mentions cooling during irradiation does not mean that Candela practices those teachings, and there is no evidence that it does.

Candela's testing also does not show cryogen remains on the skin during irradiation.[4] Again, Palomar did not authenticate the document. If it had asked a competent witness about the document, it would have learned that this test is not relevant

---

[3] Dr. Bass admitted that "a complex bench experiment" is necessary to test whether cryogen remains on the skin during irradiation; he did not testify that it could simply be visualized—because it cannot. (Bass Dep., Ray Dec. Ex. 2, at 97:21-98:18; Supp. Hsia Dec. ¶ 6.)

[4] Palomar improperly tries to shift the burden onto Candela to prove that cryogen does not remain on the skin. It is Palomar's burden to prove that cryogen remains on the skin—a burden that it has not met.

la-1089653                                         3

to hair removal because a 3 ms delay is never used for hair removal; the minimum delay is 30 ms, as evidenced by Candela's treatment guidelines. (Supp. Hsia Dec. ¶ 2, Exs. 1-3.) Moreover, the flame is from the decomposition of cryogen *gas in the air* over the treatment area—which unlike *liquid on the skin* cannot cool during irradiation. (*Id.*)

Lastly, Candela's product literature does not state that the DCD cools during irradiation. The literature states that the cryogen that is sprayed before irradiation stays on the epidermis and does not affect the dermis—none of it states or implies that cryogen remains on the skin during irradiation. Moreover, had Palomar asked a witness about these marketing documents, it would have learned that the statements are generalizations by non-scientists, not precise statements by scientists about how the cooling works.

In short, Palomar has failed to demonstrate that Candela's devices cool during irradiation. Therefore, summary judgment on claims 1-8 and 19-20 is appropriate.

        **C.**    **Candela Is Entitled to Summary Judgment on Claims 1-8 And 19-20 Because Palomar Has Not Introduced Any Admissible Evidence of Cooling to a Selected Depth**

Claims 1 and 19 each require cooling the skin surface in said skin region to a selected depth during irradiation. Claim 19 further requires cooling to that selected depth prior to irradiation. Palomar offers no admissible evidence to controvert that while Candela's devices allow the user to adjust the amount of cooling, there is no way to select the specific depth of cooling to occur during (or prior to) irradiation. The marketing documents it introduces only suggest that Candela's DCD generally cools the upper layers of skin, but they do not show that a user can choose a particular, desired depth of cooling and maintain that depth during irradiation. Indeed, Dr. Bass admitted that he did not know how to cool to a selected depth. (UF 14-16.)

Palomar concedes that the Candela devices do not cool to the same selected depth prior to and during irradiation, but tries to avoid non-infringement by advancing a new, tortured construction that would permit the same claim term—"a selected depth"—to have different meanings for the periods prior to irradiation and during irradiation. This

makes no sense. The claim recites cooling to "*a selected depth* prior to step (a) and during step (a)," not "cooling to a selected depth prior to step (a) and cooling to another selected depth during step (a)." Moreover, the limitation further requires that "there is at most minimal heating of skin in said skin region *to said selected depth.*" If the selected depth before and during irradiation could be different, the claim would be indefinite because "*said* selected depth" could refer to either one. Even if "a" can sometimes mean "one or more," the claim language here makes clear that reading "a selected depth" to permit different selected depths would lead to a nonsensical result. *See Laminations, Inc. v. Roma Direct Mktg. LLC*, 516 F. Supp. 2d 404, 415 (M.D. Pa. 2007) (Claim terms "are presumed to be used consistently throughout the patent .... This presumption logically takes on greater force where, as here, the identical terms are used in the same claim.).

Because Candela's devices do not cool to a selected depth, summary judgment on claims 1-8, and 19-20 is appropriate. It is also appropriate on claims 19-20 because Candela's devices do not cool to the same selected depth before and during irradiation.

### D. Candela's Applicators Do Not Contact the Skin Surface in Said Skin Region And Thus Do Not Infringe Claims 1-8 and 27

Palomar directs the Court to numerous vague documents and testimony to support its assertion that Candela's distance gauge is part of its handpiece. There is no reason, however, for the Court to rely on such secondary evidence when the best evidence of the physical attributes of Candela's devices is the devices themselves. Examination of the devices demonstrates without a doubt that the distance gauge is a separate component, not part of the handpiece. Moreover, the Court construed "applicator" as "a device for applying optical radiation." There is no dispute that the handpiece applies optical radiation and the distance gauge does not.

Even if the distance gauge were part of the applicator, it does not contact the *skin surface in said skin region*. "Skin region" is construed as "the skin area from which a plurality of hairs is to be simultaneously removed." This area is encircled, but not contacted, by the distance gauge. Palomar glosses over this limitation by generally

discussing contact with the skin, but not the "skin surface in the skin region." The only exception is when Palomar conflates Candela's devices with Cutera's.[5] Candela's devices, however, are entirely different from Cutera's, in which a cooling foot first contacts and cools the "skin region" and hairs from the same "skin region" that the foot cooled are then irradiated. In the Candela devices, the distance gauge never contacts the skin area from which hairs are simultaneously removed.

With respect to the conclusory Bass testimony about light scattering under the distance gauge, there is no evidence that hairs are removed due to scattering. His declaration tellingly does not state that hairs are removed, and at his deposition he could not offer any basis for his conclusion that scattering would lead to removal of hairs under the distance gauge—because they would not. (Bass Dep., Supp. Ray Dec. Ex. 7, at 256; Supp. Hsia. Dec. ¶ 4.) Because Palomar has advanced no evidence that hair would be removed under the distance gauge, it has failed to show that the distance gauge is in contact with the "skin surface in said skin region."

### E. Candela Does Not Infringe Claim 27 Because Its Devices Are Not Adapted to be in Pressure Contact with the Skin Region

"Adapted to be in pressure contact . . . with the skin surface in said skin region" has been construed as "designed to be touching with pressure a portion of the skin surface . . . in the area of skin from which a plurality of hairs is to be simultaneously removed." Palomar has not presented any evidence that Candela's devices are *adapted to be* or *designed to be* in pressure contact. All Palomar offers are unauthenticated videos that it claims show pressure contact. Had Palomar asked a competent witness about the arm video, for example, it would have learned that the video depicts an old model metal distance gauge. (Supp. Hsia Dec. ¶ 5.) Because the metal got hot, users dipped the gauge in water to cool it before use. (*Id.*) The rings on the skin are water deposited by the wet

---

[5] Palomar puts great emphasis on the Cutera case. This case, however, involves Candela's unique devices and Palomar never has established that Candela's devices operate in the same way as Cutera's—because they do not. Moreover, Palomar never produced the unredacted summary judgment briefing in Cutera; it is therefore unfair for Palomar to rely so heavily on the Cutera proceedings without having given Candela an adequate opportunity to examine the arguments and develop responses.

distance gauge.  (*Id.*)  They are not the result of blanching (as evidenced by the lack of a bulge in the middle of the ring and the length of time the rings remain (blanching disappears immediately whereas evaporation takes time); the rings stop appearing later in the video as the water dries off of the gauge.  (*Id.*)  Moreover, even if pressure were applied, it would not have been applied to the "skin region," which is encircled by and not touched by the distance gauge.  Palomar also does not address the contraindications to applying pressure, which demonstrate that the devices are not designed to be touching with pressure.  Therefore, Candela is entitled to summary judgment on claim 27.

### F. Candela Does Not Infringe Claim 32 Because Palomar Has Not Demonstrated that Candela's Lenses Are Used for Converging

Palomar fails to address whether Candela's lenses are used *for* converging, as required by the Court's construction, and offers no evidence to demonstrate that the lenses are used for this purpose—because they are not; rather Candela's lenses are used to produce a magnified image of the light emerging from the fiber, like a projector projects magnified image of a slide.  (Supp. Hsia Dec. ¶ 7.)  Palomar focuses on the convex nature of the lenses instead of their purpose in the accused devices.  Convex lenses, however, are not always or necessarily used for converging.  Indeed, according to Palomar's own document, converging lenses also can diverge light.  (Supp. Ray Dec. Ex. 9.)  Palomar has offered no evidence that the convex lenses in the Candela devices are *for* converging light.  Candela is therefore entitled to summary judgment on claim 32.

### IV. CANDELA IS ENTITLED TO SUMMARY JUDGMENT OF INVALIDITY ON CLAIMS 27 AND 32

Palomar concedes that Tanino discloses every limitation of claims 27 and 32 other than "for the simultaneous removal of a plurality of hairs."  It is undisputed that Tanino uses parameters within the preferred ranges in Table 1 of the '844 patent, which as Dr. Anderson admitted, are almost the same as Palomar's system.  Tanino's system, therefore, is necessarily capable of removing hair.  Under the law of inherent anticipation,

Tanino anticipates system claim 27. Similarly, when used in its normal manner, Tanino's system would necessarily remove hair. Tanino therefore anticipates method claim 32.

To avoid the correct conclusion that Tanino inherently discloses these limitations, Palomar ignores and mischaracterizes the law of inherent anticipation, focusing on the irrelevant issue of whether Tanino ever used his system to remove hair. They also improperly attempt to read a limitation concerning a lack of skin damage into the claims, although the dependent claims added during the reexamination proceedings requiring an absence of damage demonstrate that claims 27 and 32 do not include such a limitation.

### A. Candela's Invalidity Arguments Have Not Been Ruled on by the Court or the PTO

Faced with an unwinnable battle on the merits, Palomar attempts to obfuscate the issues by suggesting incorrectly that the PTO and the Court have previously considered Candela's invalidity arguments. First, there is no indication at all that the PTO considered Tanino. References are only considered to the extent explained by the party filing the information. *See* MPEP § 2256, Bjorge Dec. Ex. 1. Palomar failed to provide any explanation of Tanino. (Bjorge Dec. ¶¶ 11-16.) Because Tanino was one of over 300 references that Palomar submitted during the reexamination, it is highly unlikely that the Examiner actually evaluated whether Tanino anticipated claims 27 and 32. (*Id*. ¶ 17.)

Second, as Palomar concedes, Candela is not estopped from asserting invalidity based on references that were before the PTO during reexamination. It is entirely proper to do so. *See In re Etter*, 756 F.2d 852, 857 (Fed. Cir. 1985) (intent that challenges to validity in reexamination and court be distinct and independent is reflected in legislative history). Candela made a choice in requesting reexamination based primarily on Zaias when the case was stayed for a third-party reexam, quickly filing a narrowly-tailored reexam request that would invalidate all 11 of the asserted claims.[6] (Candela's request

---

[6] Morrison & Foerster did not represent Candela at that time and was not involved in this decision. Candela moved for summary judgment only on claims 27 and 32 because there are no disputed issues of material facts relating to the anticipation of these claims by Tanino. Contrary to Palomar's contentions, Candela contests the validity of all nine asserted claims—not just 27 and 32.

resulted in the revocation of 3 claims, including 2 asserted claims.) To have also based the request on inherent anticipation of claims 27 and 32 would have delayed the filing.

Third, in arguing that it is "difficult" for Candela to meet its burden of establishing invalidity because Tanino was disclosed during the reexamination, Palomar relies on inapposite cases, most of which concern prior art that was actually discussed by the Examiner.[7] In *Pharmastem*, although the prior art at issue was thoroughly considered by the PTO, the Federal Circuit found the claims to be invalid and reversed, demonstrating that the burden can be met in this context. *See* 491 F.3d at 1366-67.

Finally, the Court has not previously considered Tanino. As shown below, Tanino differs significantly from the Kuhns and Ohshiro references previously addressed in the Cutera case. Candela also is not bound by the decisions in that case and, as a matter of fairness, is entitled to its day in court.

### B. Palomar Has Not Refuted Candela's Showing that Claim 27 is Invalid as Anticipated

Palomar concedes that Tanino teaches an apparatus with each of the structural limitations of claim 27, including optical radiation with a wavelength, fluence, and pulse duration within the ranges recited in the claim. Palomar's only defense is that Tanino allegedly does not teach the simultaneous removal of a plurality of hairs. Palomar does not dispute that Tanino teaches optical parameters that are within the preferred ranges of those recommended for hair removal in the '844 patent. The Tanino system, therefore, also must remove hair. If the Tanino system did not remove hair, it would mean that the patent does not provide the necessary guidance to allow one to make the device of claim 27, and the claim would be invalid for lack of enablement. The Federal Circuit explained this point in *Mehl*: "MEHL/Biophile does not dispute on appeal that the laser operating parameters disclosed in the article substantially coincide with those disclosed in the

---

[7] *See*, *e.g.*, *Hewlett-Packard,* 909 F.2d 1464, 1467 (Fed. Cir. 1990) (prior art discussed in telephone interview resulted in claim amendment); *Polaroid Corp.*, 789 F.2d 1556, 1560 (Fed. Cir. 1986) (prior art reference fully discussed in patentee's remarks); *Glaxo Group*, 376 F.3d 1339 (Fed. Cir. 2004) (prior art listed on cover of patent-in-suit as only one of four patents considered by examiner); *Patlex Corp*, 758 F.2d 594 (Fed. Cir. 1985) (statements regarding burden are *dicta*).

patent. Accordingly, to the extent the embodiment in the patent achieves hair depilation, so does the Polla method." *Mehl*, 192 F.3d 1362, 1366 (Fed. Cir. 1999).[8]

It is irrelevant to the anticipation analysis whether Tanino himself ever aimed the laser at any skin from which hair could be or was removed, or whether Tanino describes such a treatment. Claim 27 is an apparatus claim. Tanino anticipates this claim because it discloses a system that inherently would remove hair, whether or not the system was used to do so. (In fact, the Tanino system actually removed hair. (UF 62-63.) )

*In re Schreiber*, 128 F.3d 1473 (Fed. Cir. 1997) makes clear that the fact that the Tanino device is capable of removing hair is sufficient to establish anticipation. Palomar does not distinguish *Schreiber* or contest its holding—"the recitation of a new intended use for an old product does not make a claim to that old product patentable." *Id*. at 1477. In *Schreiber* the claim covered a dispensing top for passing several kernels of popcorn at a time. *Id*. The prior art, which concerned "a spout for nozzle-ready canisters," did not "address the use of the disclosed structure to dispense popcorn." *Id*. at 1475, 1477. But, because the spout was inherently capable of performing the claimed function—although there was no indication that anyone ever had contemplated using it for dispensing popcorn—the Federal Circuit upheld the anticipation ruling. *Id.* at 1478-79. Similarly, Tanino teaches a laser system for skin treatment that is capable of simultaneous removal of a plurality of hairs. It therefore inherently discloses this limitation of claim 27.

In its opening brief, Candela presented overwhelming evidence that the device described in Tanino was capable of removing hair and indeed did so. Palomar does not address most of this evidence and does not provide any basis for their assertion that the Tanino system would not remove hair even though it uses the preferred optical

---

[8] Palomar's efforts to distinguish *Mehl* are unavailing. The Federal Circuit rejected the argument that the RD-1200 Manual anticipated the claim because it included a limitation requiring "aligning a laser light applicator substantially vertically over a hair follicle," that was not disclosed expressly or inherently by the manual. *Id.* at 1365. By contrast, the Polla article inherently taught the required alignment over the hair follicles because of the described orientation of the laser beam relative to the skin. *Id*. at 1366. Contrary to Plaintiff's representations, the discussion of injured follicles in the Polla article concerned the alignment limitation, and did not relate to the Federal Circuit's decision regarding the "hair depilation" limitation. *Id.*

parameters taught in the '844 patent. Similarly, Palomar does not address the fact that Dr. Anderson himself noted that the Toshiba laser (*i.e.* Tanino's device) had virtually the same optical parameters as Palomar's own early laser hair removal system. Palomar's response to Dr. Anderson's testimony that ███████████ ███████████ is a non sequitur; they cite his testimony that ███████████ ███████████ (Opp. n.17.) The purpose of the treatment is irrelevant.[9] The testimony underscores the critical point—the Tanino system was capable of removing hair—by showing the commercial product described in the article actually removed hair.

Instead of introducing evidence that the Tanino system would not remove hair, Dr. Bass baldly states that it would not do so. Such a conclusory statement is insufficient to defeat summary judgment. *See Hayes*, 8 F.3d at 92 (expert declaration must include factual basis and process of reasoning which makes conclusion viable). Similarly, Palomar's irrelevant assertion that there is no evidence that the Tanino device was ever sold or used for hair removal cannot avoid the conclusion that Tanino anticipates because if the device were currently on sale it would infringe claim 27.[10] Because the Tanino system is capable of removing hair, it is irrelevant whether it was sold for hair removal.

### C. Palomar Has Not Refuted Candela's Showing that Claim 32 Is Invalid as Anticipated

Palomar also concedes that Tanino teaches every limitation of claim 32 other than "for the simultaneous removal of a plurality of hairs." Palomar fails to apply the law of inherent anticipation correctly. *In re King* explains the relevant standard for anticipation of a method claim by a prior art reference describing a device: "if a previously patented

---

[9] If Palomar is arguing that "an apparatus for the simultaneous removal of a plurality of hairs," means "an apparatus for the intended purpose of removing hair," rather than "an apparatus that removes hair," this phrase would be a mere statement of intended use and not a limitation. *See Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997) (where patentee defines structurally complete invention in claim body and uses preamble only to state a purpose or intended use for the invention, preamble is not a claim limitation); *Bristol-Myers Squibb Co. v. Ben Venue Labs*, 246 F.3d 1368, 1375 (Fed. Cir. 2001) ("for reducing hematologic toxicity" merely expresses purpose of method and is "non-limiting").

[10] An accused device infringes a system claim with a functional limitation (such as claim 27's "for simultaneously removing hair" limitation) if the device is capable of performing the claimed function. *See Mass Engineered Design, Inc. v. Ergotron, Inc.*, 633 F. Supp. 2d 361 (E.D. Tex. 2009) (to infringe an apparatus claim, all that is required is that the device have the claimed structure, and that it have the capability of functioning as described by the claim).

la-1089653                                          11

device, in its normal and usual operation, will perform the function which an appellant claims in a subsequent application for process patent, then such application for process patent will be considered to have been anticipated by the former patented device." 801 F.2d 1324, 1326 (Fed. Cir. 1986). Candela thus did not need to show that the Tanino laser "was necessarily aimed at hair-bearing skin from which a plurality of hairs were removed by the specific parameters used," as Palomar contends.[11] (Opp. at 25.) Rather, Candela demonstrated that the Tanino system in its normal and usual operation, would remove hair. The normal use of Tanino's system was for treating "hyperpigmented skin lesions, such as pigmented nevus (melanin particle deposition), tattoos and so on." (Tanino at 1.) Dr. Anderson admits that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓ (UF 62-63.) Hair removal also can be seen in Nakaoka. (Supp. Fitz. Dec. ¶ 11.) Palomar fails to rebut Candela's overwhelming evidence that the Tanino system in normal use would remove hair.[12] Claim 32, therefore, is invalid as anticipated.

### D. Palomar's Contention of No Anticipation Due to Alleged Skin Injury Fails

Claims 27 and 32 do not include a requirement that the skin not be injured when hair is removed. Palomar's efforts to read this limitation into the claims are improper. First, decisions in the Cutera case are not binding on Candela. *See Stevenson v. Sears, Roebuck & Co.*, 713 F.2d 705, 711 (Fed. Cir. 1983) (grossly inequitable to bind party to judgment of validity rendered in action against some other party). Second, Palomar relies on a summary judgment denial regarding art not at issue here—not a claim construction decision. Third, the '844 reexamination during which MGH added claims to the patent took place after the Cutera decision and highlight that Claims 27 and 32 should now be

---

[11] Palomar's arguments regarding Tanino are also incorrect. Virtually the entire body, other than the soles of the feet and palms of the hand, are covered with hair, so it is a near certainty that any pigmented skin treated by Tanino's device would contain hair, and the hair thus would be irradiated. (Supp. Fitz. Dec. ¶ 3.)
[12] Palomar also fails to show that the patent statutes changed the long-standing rule that one cannot patent a new and analogous use for an old process. The Federal Circuit recently explained this rule by noting that a method of using a composition to waterproof shoes likely would not be patentable over a prior patent for using it to shine shoes, while a method of using the composition on the skin to make hair grow likely would be patentable. *Catalina Mktg. v. Coolsavings.com*, 289 F.3d 801, 808 (Fed. Cir. 2002). Because hair removal is a result of the normal use of the Tanino device to treat the skin, such a method is not patentable.

interpreted to permit skin injury. Under the doctrine of claim differentiation, Claim 32 must allow injury to the skin, otherwise Claim 45[13] (which depends from claim 32) would be the same as claim 32, and not be patentably distinct. *See Liebel-Flarsheim Co. v. Medrad*, 358 F.3d 898, 910 (Fed. Cir. 2004). MGH sought to expand the scope of its patent's coverage by adding claims, and must now live with the consequences.

Palomar's assertion that the claim differentiation doctrine should be disregarded because claim 32 was allegedly previously construed to require an absence of skin injury is nonsensical because the Court has not construed this claim in this manner. Palomar—not Candela—is the one trying at this late juncture to modify the claim's construction. Palomar was well aware of the Cutera summary judgment decision at the time of the claim construction briefing in this case. If Palomar intended "for the simultaneous removal of a plurality of hairs from a skin region" to mean "for the simultaneous removal of a plurality of hairs from a skin region without significant injury to the skin," it should have proposed such a construction. Instead, aware that Claim 32 did not include such a limitation, MGH added claims with this limitation to the patent during the reexamination proceedings. Dr. Bass's conclusory opinion—post claim construction—in contravention of the doctrine of claim differentiation should be rejected.

Nor does Dr. Fitzpatrick's testimony that significant epithelial peeling is undesirable in laser hair removal provide a basis for injecting a requirement of an absence of skin injury into the claims. The claims at issue do not require that hair be removed in a manner that would be clinically acceptable. MGH could have claimed hair removal without significant skin injury (as it did with respect to other claims) or that achieved specified optimal clinical results, but elected not to do so.[14] Thus, even if Tanino inherently teaches a less than optimal method of hair removal, this would not change the fact that hair removal is disclosed and the reference anticipates claims 27 and 32.

---

[13] Claim 45 recites, "A method as claimed in claim 32, where in the tissue surrounding the hair follicles is not significantly damaged."
[14] *See Celeritas Tech. v. Rockwell Int'l*, 150 F.3d 1354 (Fed. Cir. 1998) (inventor elected not to claim solution to problem with prior art modems; claim not limited to modem that operated optimally).

Moreover, even if the phrase "for the simultaneous removal of a plurality of hairs" is interpreted to mean that hair is removed without significant injury to the skin, as Palomar argues, Tanino would still anticipate claims 27 and 32.  First, Candela demonstrated that the Tanino device would not injure the skin when used to remove unwanted hair from people with suitable skin types.  (Fitz. Dec. ¶ 30.)  Palomar points to no contrary evidence.[15]  Instead, it relies on Nakaoka, which indicates that epidermal peeling (peeling of the extremely thin—approximately one tenth of a millimeter—upper surface of the skin) occurs as a necessary part of the treatment when removing epidermal pigmented lesions.  (Supp. Fitz. Dec. ¶¶ 5-6.)  That Tanino's system might cause epidermal peeling when treating pigmented lesions does not suggest that it would cause peeling when used to remove hair from normal skin without pigmented lesions, which would not absorb the laser energy as strongly.  (*Id.*)  Nakaoka therefore is irrelevant to anticipation of claim 27, because it has no bearing on whether Tanino's device is capable of removing hair without significant injury.

Second, treatment of pigmented lesions is only one of the "normal and usual uses" indicated for the Tanino system.  Palomar has proffered no evidence that the device would significantly injure the skin when used for other skin treatments.  Contrary to Palomar's representations, Nakaoka does not suggest that his treatments typically resulted in significant skin injury, or that hair was removed with skin rather than from skin.  Instead, he states that almost all the pigmented lesions healed with "acceptable scar formation."  (Supp. Fitz. Dec. ¶ 7.)  This means that if any scarring occurred, it was cosmetically acceptable.  (*Id.*)  Palomar's assertion that the skin became "moderately or remarkably scarred" also is baseless.  In fact, Nakaoka states, "Moderate to severe scar formation appeared in 5 of 282 patients"—less than 2% of the patients treated.  (*Id.*)

---

[15] Dr. Fitzpatrick's testimony that Tanino's device likely would damage the skin when used on skin type VI—the darkest skin type from which it is most difficult to remove hair (Supp. Fitz. Dec. ¶ 4)—proves nothing.  The inventors' testing of Palomar's EpiLaser device resulted in blistering in 10% of patients, and they only tested it on skin types I-IV (fair to olive-skinned), excluding types V-VI from the study.  (*Id.*)  Despite this injury, Palomar asserts that its EpiLaser embodies the claimed invention.  Thus, a hair removal device need not be capable of removing hair from all skin types without injury to embody the claimed invention, and Tanino's device need not be capable of removing hair from all skin types without injury to anticipate.

The epidermal peeling described in Nakaoka does not remove "hair with skin." Rather, the laser irradiation used in treating epidermal pigmented lesions also damages the hair follicles. This results in hair being removed from the skin, in the same manner as hair is removed during laser hair removal performed on normal skin. The hair is not removed as a result of the epidermal peeling. (Supp. Fitz. Dec. ¶¶ 8-10.) Nakaoka's before and after photographs also demonstrate that hair is removed without any significant, lasting skin injury. (Supp. Fitz. Dec. ¶ 11.)

Finally, Palomar's assertion that Tanino is similar to the Kuhns and Ohshiro references previously considered by the Court, and thus similar skin injury would result, is incorrect. Figure 7 of Kuhns, relied on by Cutera, shows the result from ruby laser exposure at a fluence (or energy density) of 200 $J/cm^2$, five times the maximum fluence emitted by the Tanino system, well outside the preferred values of 30-50 $J/cm^2$ set forth in the '844 patent. (Supp. Fitz. Dec. ¶ 13.) Ohshiro did not use the Toshiba laser, as Palomar asserts. He used the "Korad K2 industrial system modified by Ohshiro for dermatological application as Model MR160-1 (Fig. 3)." (Bass Ex. 8, Ohshiro at 389.) The fluence applied by Ohshiro's laser extended up to about 816 $J/cm^2$, well above the 40 $J/cm^2$ maximum fluence of Tanino. (Supp. Fitz. Dec. ¶ 14.) The Tanino system would thus be much less likely to damage the skin than the systems used by Kuhns or Ohshiro.

## V.   CONCLUSION

For the foregoing reasons, Candela respectfully requests that its Motion be granted in all respects.

Dated: September 10, 2010

CANDELA CORPORATION

By its attorneys:

/s/ Wendy J. Ray

MORRISON & FOERSTER LLP
555 W. Fifth Street, Suite 3500
Los Angeles, California 90013

                                                    Joan M. Griffin (BBO #549522)
                                                    P.O. BOX 133
                                                    Dublin, New Hampshire 03444

## CERTIFICATE OF SERVICE

I, Wendy J. Ray, hereby certify that a copy of the foregoing document has been served upon all opposing counsel of record, by ECF on this 10th day of September, 2010.

                                              /s/ Wendy J. Ray
                                                 Wendy J. Ray