UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 06-11400-RWZ

PALOMAR MEDICAL TECHNOLOGIES, INC., and
THE GENERAL HOSPITAL CORP.

v.

CANDELA CORPORATION

MEMORANDUM AND ORDER

April 26, 2011

ZOBEL, D.J.

Palomar Medical Technologies, Inc., and The General Hospital Corporation (together, "Palomar") sue Candela Corporation for infringement of U.S. Patent No. 5,735,844 (filed Jan. 30, 1996) (Docket # 162 Ex. 1), titled "Hair Removal Using Optical Pulses." Candela manufactures at least three laser devices, the GentleLASE, GentleYAG, and GentleMAX (collectively, the "Candela Products"), which are designed to remove hair by damaging the follicle with laser radiation, among other medical uses.

Palomar initially asserted that the Candela Products, in combination with other devices no longer at issue in the case, infringed claims in both the '844 patent and U.S. Patent No. 5,595,568 (filed Feb. 1, 1995). After this court issued a claim construction order (Docket # 72) and ex parte patent reexaminations of both patents concluded (Docket ## 121 and 122), Palomar narrowed its infringement allegations to claims 1-8,

19-20, 27, and 32 of the '844 patent.[1]  Candela now moves for summary judgment of non-infringement of all asserted claims and invalidity of claims 27 and 32 (Docket # 141) and to strike certain materials submitted with Palomar's opposition to the summary judgment motion (Docket # 171).[2]

**I.	Analysis**

Summary judgment will be granted if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

**A.	Infringement**

Infringement is a question of fact.  Bai v. L & L Wings, Inc.,160 F.3d 1350, 1353 (Fed. Cir. 1998).  Summary judgment is appropriate "when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device."  Id.

---

[1]The record is not entirely clear which claims Palomar alleges are infringed.  The briefing refers to claims 1-8, but Palomar's expert on infringement opines that claims 1-2 and 6-8 are infringed.  (Bass Supplemental Expert Report ¶ 7, Docket # 161 Ex. 5.)  Claims 2-8 depend from claim 1.

[2]Palomar argues that Candela is precluded from asserting non-infringement or invalidity because that company's Fed. R. Civ. P. 30(b)(6) designee stated in a deposition that he did not know whether the Candela Products infringed or the asserted patent claims were invalid.  (Amberg Dep. 18-20, Docket # 162 Ex. 3.)  These are questions of legal strategy, not fact, and Candela objected in response to the notice of deposition and at the deposition to any inquiry into "issues of law."  (Candela Objections to First Notice of Dep., Docket # 170 Ex. 6; Amberg Dep. 17.)  Candela is not precluded from asserting either non-infringement or invalidity.

2

### 1. Claims 1-8 and 19-20

Claims 1 and 19, upon which respectively claims 2-8 and 20 depend, require cooling of the skin surface "during" the application of the optical radiation. The Candela Products may be operated with a Dynamic Cooling Device ("DCD") that sprays cryogen on the skin surface prior to the application of the optical radiation. The cryogen rapidly evaporates from, and cools, the warmer skin. The duration of the spray is adjustable to as long as 100 ms, with a minimum delay before the laser pulse of 3 ms. Treatment guidelines for hair removal, depending on skin type, specify no more than a maximum 60 ms duration with a 40 ms delay, or a 50 ms duration with a minimum 30 ms delay. (Treatment Guidelines, Docket # 169 Ex. 1-3.) Longer durations and shorter delays are used for non-hair removal treatments.

Palomar argues that this cryogen has not fully evaporated from the skin when the laser is fired and thus there is cooling "during" the application of the radiation. In support, the company presents arguments premised on both patent language and fact.

#### a. Patent Language

The '844 patent specification describes an embodiment which cools without an applicator, "for example cryogenically." (Col.15 ll.41-44.) The patent does not connect that embodiment with claims 1-8 or 19-20, and the critical issue is the timing, not the use, of the cryogen. This specification language does not establish that the cryogen spray of the Candela Products satisfies the cooling limitation.

Candela's expert on infringement, Dr. Rohrer, used two graphs in his rebuttal expert report to depict cooling (Rohrer Expert Report Excerpt, Docket # 162 Ex. 12)

which, Palomar says, are taken from a different patent, No. 5,814,040 (filed May 15, 1995) (Docket # 162 Ex. 13). The '040 patent teaches cryogenic cooling of the skin surface of a port wine stain undergoing laser irradiation. Dr. Rohrer also indicated in his expert report that the DCD includes technology patented under the '040 patent.

One of the graphs in the '040 patent, "Figure 4," depicts the change in temperature over time beginning with the cryogen spray and continuing post irradiation. ('040 Patent col.6 ll.39-63.) The other, "Figure 5," depicts temperature over time without cooling. (Id.) The '040 patent specification, in language not specific to Figure 4, states that the quantity of cryogen can be controlled so that it remains on the skin during and after irradiation. (Id. at col.8 ll.37-39.)

While Dr. Rohrer agreed in his deposition that the the figures in his expert report and the '040 patent are substantively identical, he testified that he was given the graphs by another individual and that he had not seen '040 patent (Rohrer Dep. 120-24, Docket # 162 Ex. 8). He does not say that the DCD device, when used for hair removal, practices any claim of the '040 patent that requires cooling during irradiation. The most that a reasonable factfinder could infer from Dr. Rohrer's testimony and use of similar graphs is that he intended what his expert report graphs depict: a cryogen spurt followed by rapid cooling, then a laser pulse followed by a spike in temperature. Palomar's argument that the '040 patent's substance is incorporated into Dr. Rohrer's report because they share similar graphs is belied by the difference in cooling parameters illustrated in Figure 4 and used with the Candela Products for hair removal. Figure 4 depicts an 80 ms cryogen burst ('040 Patent col.6 ll.39-44), more than the

4

maximum of 60 ms specified for the Candela Products, and the '040 patent also teaches that the "interval between the application of cryogenic spurts and the onset of the laser pulse . . . are usually less than 1 millisecond" (id. at col.6 ll.1-4), not the 30+ ms used with the Candela Products.

### b. Factual Evidence of Cooling

To show, as a factual matter, that cryogen remains on the skin during irradiation, Palomar points to deposition testimony, documents produced by Candela, and its own expert's declaration. Upon review, this evidence is insufficient to demonstrate a genuine issue of fact.

Dr. Hsia, the Chief Technology Officer for Candela, and Dr. Rohrer admit in deposition testimony that cryogen takes some period of time after it is sprayed on skin to fully evaporate, that it cools, and that if enough is sprayed, some might remain on the skin when the laser is fired. (See Palomar Findings of Fact in Supp. of Opp'n ¶¶ 21, 23, 28, 30, Docket # 160.) None of this is in dispute. What Hsia and Rohrer do not say, and what Palomar must prove, is that cryogen sprayed by the Candela devices, when used as designed for hair removal, remains on the skin when the laser fires.

An email documents a test of the Candela device on black construction paper. A flame was visible at the "peak of lasing" which is identified as "the cryogen flaming." (Docket # 162 Ex. 14.) Neither the email nor any other evidence identifies this test as representative of the use of the device on skin for hair removal, and the test expressly states that the cryogen was fired for 60 ms with a 3 ms delay, which is inconsistent with the specified duration and delay settings for hair removal use. (Id.)

5

Another document contains a chart illustrating change in temperature over time for different cooling methods. (Document # 162 Ex. 21.) There is no evidence as to the chart's origins or the details of what it depicts. The most that can be discerned is that a variety of incompletely identified cooling methods rapidly lower the temperature of some unspecified object at different rates. Without more information, this chart is irrelevant.

Candela marketing materials state that the cryogen cools the skin and remains on the epidermis with no effect to the dermis. (Palomar Findings of Fact in Supp. of Opp'n ¶¶ 39-42, 44.) This is not in dispute. The most favorable statements for Palomar are found in a marketing document that appears to be a slideshow for a "Sales Training GentleLASE Family" presentation. (Document # 162 Ex. 19.) There is no evidence that it is a final draft, who prepared this document, or of the target audience. According to the slides, "the presence of epidermal melanin causes a heat buildup . . . . Consequently, the skin must be cooled during the laser pulse." (Id. at CANMA007894.) The cooling device "cools the epidermis during . . . laser treatments." (Id. at CANMA007895.) The presentation also includes a chart which depicts cooling over time and, in contrast with the aforementioned language, indicates skin temperature levels off or begins to rise prior to the laser firing. (Id. at CANMA007898.) Because this document is internally contradictory, and there is no evidence as to the author or audience from which a factfinder could infer the significance of the scientific statements therein, it is of minimal probative value.

Finally, Palomar points to the opinion of its expert on infringement and invalidity,

Dr. Bass:

> Based on my understanding of the way the Candela's devices work (including my observation of the video produced by Dr. Rohrer and attached as Exhibit 47 to the Declaration of Sarah Beigbeder Petty), cryogen continues to evaporate while the Candela laser is fired, and therefore the Candela devices therefore [sic] cool during irradiation.

(Bass Decl. ¶ 14, Docket # 161.)

Candela argues that this opinion lacks foundation and is therefore insufficient to defeat a motion for summary judgment and moves to strike. "[C]onclusory allegations, improbable inferences, and unsupported speculation," whether in lay testimony or an expert opinion, "are insufficient to defeat summary judgment." Magarian v. Hawkins, 321 F.3d 235, 240 (1st Cir. 2003). An expert affidavit "must at least include the factual basis and the process of reasoning which makes the conclusion viable." Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 92 (1st Cir. 1993).

The declaration itself contains no explanation as to how Dr. Bass arrived at his opinion, and he stated in his deposition that he did not test for the presence of cryogen when the laser fired. (Bass Dep. 97-98, Docket # 148 Ex. 2.) The cited video is not illuminating. Dr. Rohrer does not say or otherwise indicate in the video that cryogen remained on the skin when the laser fired.

Palomar, in response to Candela's motion to strike, points to paragraphs 64-108 of Dr. Bass's expert report (Docket # 161 Ex. 2), paragraphs 16-17 of his reply report (id. at Ex. 4), and paragraphs 74-75 and 86-88 of his supplemental report (id. at Ex. 5) as supplying the necessary factual basis.

The expert report, in relevant part, contains only the conclusory statement that

7

"[a]s Candela's product literature makes clear, the . . . cooling provided by the Candela's DCD technology . . . occurs . . . during irradiation." (Bass Expert Report ¶ 84 (internal quotation marks omitted).) The first document cited in support is a marketing document which states that the cryogen is sprayed "before," not during, the irradiation. (Docket # 181 at Ex. 12.) The second directly contradicts Dr. Bass's statement: "The skin surface is, has [sic] previously been cooled when the laser pulse is applied to the skin." (McMillan Dep. 110-11, Docket # 181 Ex. 11.)

The reply report contains only the conclusory statement that "cryogen spray remains on the skin surface at the time the laser or light pulse is delivered to the skin . . . . This process will necessarily result in the skin being cooled during irradiation." (Bass Reply Expert Report ¶ 17.) In support, Dr. Bass cites documents, none of which are attached to his report or identified by Palomar's counsel. Some of the citations have parenthetical quotations, but the only quote that supports his conclusion that the cryogen remains on the skin during irradiation is from the "Sales Training GentleLASE Family" marketing document already discussed.

The supplemental report simply says the cooling occurs "during irradiation" and cites the same two documents as the expert report. (Bass Supplemental Expert Report ¶ 88.)

Dr. Bass's expert opinion that cryogen remains on the skin when the laser is fired is therefore without factual foundation. The motion to strike is granted. No reasonable jury could find from the remaining evidence that cryogen remains on the skin, and the Candela devices cool, during irradiation.

8

### 2. Claim 27

This claim is limited, as construed, to an optical radiation device designed to be touching, with pressure, a portion of the skin surface in the area of skin from which a plurality of hairs is to be simultaneously removed. (Claim Construction Order 5-6.) The Candela Products include an optical radiation delivering handpiece to which is attached a distance gauge. (<u>See</u> diagram in Candela Statement of Facts ¶ 1, Docket # 149.) The gauge is inserted into the radiating end of the handpiece. It is a ring, hollow in the center, mounted a distance from the end of the handpiece. This ring is touched against the skin and thereby maintains a constant distance between the radiating handpiece and the skin.

Candela, through the declarations of Drs. Rohrer and Hsia, explains that the optical radiation is applied to an area several millimeters inside the boundary of the hollow distance gauge. (Candela Statement of Facts ¶ 9.) Thus, it argues, the gauge does not contact the "area of skin" from which hairs are being removed. Palomar, through the declaration of Dr. Bass, agrees that the radiation is applied within the boundaries of the distance gauge but asserts that there is "scattering" of the light within the skin and this scattered light thermally damages the hairs in the skin area in pressure contact with the distance gauge. (Palomar Opp'n 14 (citing Bass Decl. ¶ 20), Docket # 159.) There is no allegation that the device removes hairs in contact with the gauge.

Candela argues that the Bass opinion is conclusory and moves to strike. Bass, in his declaration, does not cite any factual support or explain his reasoning underlying

9

his assertion that light scatters under the distance gauge and thermally damages hair follicles, and he does not state that hairs under the gauge are removed. (Bass Decl. ¶ 20.) The expert report does not mention scattering. The reply report includes only conclusory statements about scattering and "thermal[] damage[]", not hair removal, without an explanation of reasoning or factual support. (Bass Reply Expert Report ¶ 14.) The supplemental report does not mention scattering. Dr. Bass's opinion that scattered light thermally damages hairs in the skin area in pressure contact with the distance gauge lacks any foundation, and the motion to strike is granted. Palomar points to no other evidence to carry its burden of proving that the Candela Products contact the skin area, and no evidence whatsoever of hair removal in the area, so the motion for summary judgment is granted as to claim 27.

### 3. Claim 32

The method of claim 32 requires the application of optical radiation through an "element," a term construed to mean "a device or component of a device for converging optical radiation." (Claim Construction Order 6.) Candela argues that its devices do not converge and contain no converging components. Palomar responds with evidence, in the form of Dr. Bass' declaration and reports and documents produced by Candela, that components in the devices do converge light.

Dr. Bass states that the Candela Products include at least one convex lens, and convex lenses have the physical property of converging light. (Bass Decl. ¶ 22.) The presence of convex lenses is confirmed by Dr. Hsia. (Hsia Dep. 79, 96, 113, Docket

# 162 Ex. 11.) Dr. Bass conducted empirical testing which, he says, demonstrated that the lenses converge. (Bass Dep. 75.)

During discovery Candela produced engineering schematics of five lens assemblies which show lenses with a convergent effect (Palomar Findings of Fact in Supp. of Opp'n 75). At least two of those assemblies, it is undisputed, are used for hair removal. (See Hsia Supp. Decl. ¶ 8, identifying lens assemblies not used for hair removal, Docket # 169.) Another document produced by Candela is associated with an "engineering change order" for the GentleYAG laser and describes "Plano-Convex Glass Lenses" as "used to converge incident light." (Docket # 162 Ex. 34.) Candela disputes the inferences Palomar draws from these documents, but in combination with Dr. Bass' report they are sufficient to demonstrate a genuine issue of fact as to the presence of "a component of a device for converging optical radiation."

**B.    Invalidity**

Candela asserts that claims 27 and 32 are invalid as anticipated by Development of Ruby Laser System for Medical Use, Ryuzaburo Tanino et al., Journal of the Japanese Society for Laser Surgery and Medicine (March 1991) (Docket # 161 Ex. 7) ("Tanino"). Anticipation is a question of fact. Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1327 (Fed. Cir. 2001). "A prior art reference must disclose every limitation of the claimed invention, either explicitly or inherently, to anticipate." Id. Because claim 27 is not infringed, this order considers invalidity only in respect to claim 32.

Tanino discusses the use of a ruby laser to treat hyperpigmented skin lesions, such as pigmented nevi or tattoos. Ruby lasers are identified as "preferred" in the '844 patent (col.9 ll.8-9), and the laser specifications of Tanino fall within the range, and often the preferred range, of values set forth in the patent (compare Tanino Table 1 with '844 Patent Table 1). Palomar denies that the Tanino device complies with the element and certain radiation limitations of claim 32 (Palomar's Resp. to Candela's Statement of Facts ¶¶ 50, 52-54, 56, Docket # 160), but the briefing is focused on other issues.

Claim 32, a method claim, requires that the optical radiation "simultaneously remove a plurality of hairs from said region." Tanino does not discuss hair removal. Candela argues, and Palomar disputes, that the Tanino article inherently discloses hair removal.

> Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient. If, however, the disclosure is sufficient to show that the natural result flowing from the operation as taught would result in the performance of the questioned function, it seems to be well settled that the disclosure should be regarded as sufficient.

MEHL/Biophile Int'l Corp. v. Milgraum, 192 F.3d 1362, 1365 (Fed. Cir. 1999); cf. Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 809-10 (Fed. Cir. 2002) (explaining that apparatus claims do not "necessarily prevent a subsequent inventor from obtaining a patent on a new method of using the apparatus where that new method is useful and nonobvious").

12

In MEHL, the court found that prior art discussing the effect of ruby laser radiation on pigmented cells in guinea pigs anticipated a laser hair-removal patent claim that was not limited in scope to human hair. MEHL, 192 F.3d at 1366-67. There, as in this case, the prior art laser and the patented laser shared operating parameters. The article mentioned damage to guinea pig hair follicles. Although the authors of the article did not recognize that the laser could be used for the purpose of removing hair, "the result [of hair removal] is a necessary consequence of what was deliberately intended, [and] it is of no import that the article's authors did not appreciate the results." Id. at 1366.

The Catalina court provided a hypothetical example of when an inventor could patent a new use for an old apparatus. If inventor A patented a shoe polish, inventor B could not patent the use of that product to repel water on shoes "because repelling water is inherent in the normal use of the polish to shine shoes." Catalina, 289 F.3d at 809. Inventor B could patent a method for the use of that polish on human skin to grow hair. Id.

Both Tanino and the '844 patent specify a ruby laser because it emits a wavelength which is strongly absorbed by pigment. In Tanino, the targeted pigment is found throughout the targeted skin lesion area (Palomar Findings of Fact in Supp. of Opp'n ¶ 109 with Candela Resp., Docket # 174), an area which may, incidentally, contain pigmented hair follicles. The laser heats and damages the pigment in both skin and hair. Although the extent is in dispute, the result is some skin injury (id. at ¶¶ 97-99), which may exceed what is acceptable for hair removal treatment (id. at ¶ 103). In

13

contrast, the '844 patent specifies the use of a laser like that in Tanino because, for many skin types, the hair follicle contains more pigment than the surrounding skin and the laser radiation is thus selectively absorbed by the follicle with minimal heating, and damage, to the skin. ('844 Patent col.8 ll.33-56.)

The qualitative difference in methods between Tanino and the '844 patent thus falls somewhere between the two examples of MEHL and Catalina Mktg. Int'l; pigmented skin differs from most skin types in a way that is material to the use of the ruby laser, but the two are less distinct than shoe leather and human skin. The critical question of fact is whether, in light of the difference in skin type, the use of the Tanino teaching to remove pigmented skin lesions with incidental removal of hair is "sufficient to show that the natural result flowing from the operation as taught would result in" removal of hair from normally pigmented skin.

Candela relies, in significant part, on deposition testimony of Dr. Anderson, an inventor of the '844 patent, to establish that when the Tanino laser was used to treat nevi, hair was also removed (Candela Statement of Facts ¶¶ 62-63), but his statements better illustrate this factual uncertainty as to whether the Tanino paper inherently disclosed hair removal from normally pigmented skin. Dr. Anderson states that he "was aware" at the time of invention that when a ruby laser was used to treat nevi, "the hair would be removed as well." (Anderson Dep. 63, Docket # 145 Ex. 11.) But, he later explains that "[t]he plurality of hairs removed simultaneously during that treatment is part and parcel of removing the nevus itself." (Id. at 69.) This testimony, linking hair removal with the nevus skin, along with statements by Dr. Fitzpatrick, Candela's expert

on invalidity, that the Tanino device is capable of removing hair (Fitzpatrick Dec. ¶¶ 18-32, Docket # 145), do not settle beyond reasonable dispute whether the Tanino article inherently discloses hair removal.

## II.     Conclusion

Candela's motion for summary judgment (Docket # 141) is ALLOWED as to claims 1-8, 19-20, and 27, and DENIED as to claim 32.  Candela's motion for leave to file excess pages (Docket # 164) is ALLOWED.  Candela's motion to strike (Docket # 171) is ALLOWED as to the earlier identified statements in Bass Declaration ¶¶ 14 and 19, and otherwise DENIED.  Palomar's motion to seal (Docket # 178) is ALLOWED.  Candela's motion for leave to file a reply (Docket # 181) is ALLOWED.


    April 26, 2011                                             /s/Rya W. Zobel    
        DATE                                                          RYA W. ZOBEL
                                                                         UNITED STATES DISTRICT JUDGE